# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
June 8, 2005 Session

## ABU-ALI ABDUR'RAHMAN v. PHIL BREDESEN, ET AL.

**Appeal by Permission from the Court of Appeals**
**Chancery Court for Davidson County**
**No. 02-2236-III    Ellen Hobbs Lyle, Chancellor**

---

**No. M2003-01767-SC-R11-CV - Filed October 17, 2005**

---

We granted review to address several issues regarding the Tennessee Department of Correction's protocol for executing inmates who have been sentenced to death by lethal injection. After our review of the record and applicable authority, we conclude that the lethal injection protocol in Tennessee, which includes intravenous injections of sodium Pentothal, pancuronium bromide, and potassium chloride, (1) does not violate the Eighth Amendment to the United States Constitution or article I, section 16 of the Tennessee Constitution, (2) does not violate due process provisions under the United States or Tennessee Constitutions, (3) does not deny access to the courts in violation of the United States or Tennessee Constitutions, (4) does not violate the Uniform Administrative Procedures Act, (5) does not violate the Nonlivestock Animal Humane Death Act, (6) does not violate provisions governing the practice of medicine and provision of healthcare services, and (7) does not violate the Drug Control Act or Pharmacy Practice Act. Accordingly, we affirm the judgment of the Court of Appeals.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Affirmed**

E. RILEY ANDERSON, C.J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, ADOLPHO A. BIRCH, JR., JANICE M. HOLDER, and WILLIAM M. BARKER, JJ., joined.

Bradley A. MacLean and Cynthia W. MacLean, Nashville, Tennessee, and William P. Redick, Jr., Whites Creek, Tennessee, for the Appellant, Abu-Ali Abdur'Rahman.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Joseph F. Whalen, Associate Solicitor General; and Stephanie R. Reevers, Associate Deputy Attorney General, for the Appellees, Phil Bredesen, Quenton White, Ricky Bell, Virginia Lewis, and Tennessee Department of Correction.

Stephen J. Zraleck and Melody Fowler-Green, Nashville, Tennessee, for Amici Curiae, American Civil Liberties Union of Tennessee and Sidelines Newspaper.

Peter D. Heil, Nashville, Tennessee, for Amicus Curiae, Tennessee Medical Professionals.

## OPINION

In 1987, Abu-Ali Abdur'Rahman, formerly known as James Lee Jones, ("petitioner"), was convicted of first degree murder and sentenced to death by a jury in Davidson County, Tennessee.[1] State v. Jones, 789 S.W.2d 545, 550 (Tenn. 1990). Because the petitioner's case has had a lengthy history in state and federal courts, we begin by summarizing the relevant procedural background.

## BACKGROUND

### State Court Proceedings

In February of 1986, the petitioner and a co-defendant entered the home of Patrick Daniels and Norma Norman under the guise of buying drugs. After binding and blindfolding the victims, the petitioner repeatedly stabbed Daniels in the chest while Daniels pleaded for his life, and he stabbed Norman several times in the back. Daniels died as a result of the stab wounds to his chest, but Norman survived. Id. at 550.

The jury imposed the death sentence for the killing of Daniels after determining that evidence of the following aggravating circumstances outweighed evidence of mitigating factors: the petitioner had a prior conviction for a felony involving the use of violence or the threat of violence to the person; the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; and the murder was committed during the perpetration of an armed robbery. Id. at 552-53.

This Court affirmed the first degree murder conviction and death sentence on direct appeal in 1990. Id. at 553. The United States Supreme Court denied a writ of certiorari. Jones v. Tennessee, 498 U.S. 908 (1990).

After his direct appeal, the petitioner challenged his convictions and his death sentence by filing a petition for post-conviction relief. The trial court denied post-conviction relief, and the Court of Criminal Appeals affirmed. Jones v. State, 1995 WL 75427 (Tenn. Crim. App., Feb. 23, 1995). This Court denied the petitioner's application for permission to appeal, Jones v. State, 1995 WL 75427 (Tenn., Aug. 28, 1995), and the United States Supreme Court again denied a writ of certiorari. Jones v. Tennessee, 516 U.S. 1122 (1996).

### Federal Court Proceedings

In April of 1996, the petitioner initiated what have amounted to extensive and lengthy proceedings in federal court by filing a petition for writ of habeas corpus in the United States District Court for the Middle District of Tennessee. The district court found that the petitioner had been denied effective assistance of counsel during the sentencing phase of his trial, vacated the death

---

[1] The petitioner was also convicted of assault with intent to commit first degree murder and armed robbery, for which he received consecutive life sentences. Jones, 789 S.W.2d at 545.

penalty, and granted a new sentencing hearing.  The district court further found that a prosecutorial misconduct issue could not be reviewed because the petitioner had not raised the issue in his application for permission to appeal to this Court.  Abdur'Rahman v. Bell, 999 F. Supp. 1073 (M.D. Tenn. 1998).

On appeal, a divided panel of the Sixth Circuit Court of Appeals determined that the petitioner had not established prejudice from his counsel's ineffectiveness in the sentencing phase of the trial, reversed the district court's judgment, and reinstated the petitioner's death sentence. Abdur'Rahman v. Bell, 226 F.3d 696 (6th Cir. 2000).  The United States Supreme Court denied a writ of certiorari.  Abdur'Rahman v. Bell, 534 U.S. 970 (2001).

After the denial of certiorari, the petitioner filed a motion seeking relief from the judgment in the district court and a motion seeking to vacate the judgment in the Sixth Circuit Court of Appeals.  See Fed. R. Civ. P. 60(b).  The petitioner alleged that the district court had erred in finding that the prosecutorial misconduct issue raised in the habeas corpus petition could not be reviewed.[2] The district court concluded that the petitioner's motion was a successive petition for habeas corpus relief that was precluded by 28 United States Code section 2444(b)(2).  A divided panel of the Sixth Circuit affirmed.  See Abdur'Rahman v. Bell, No. 98-6568/6569, 01-6504 (6th Cir., Jan. 18, 2002).

The United States Supreme Court initially granted the petitioner's petition for certiorari, Abdur'Rahman v. Bell, 535 U.S. 981 (2002), but then dismissed the appeal as improvidently granted.  Abdur'Rahman v. Bell, 537 U.S. 88 (2002) (Stevens, J., dissenting).  Thereafter, a majority of the Sixth Circuit, hearing the matter en banc, held that the petitioner had filed a proper motion for relief from the judgment in the district court under Rule 60(b) of the Federal Rules of Civil Procedure and that the motion was not a second or successive habeas corpus petition. Abdur'Rahman v. Bell, 392 F.3d 174 (6th Cir. 2004) (en banc).  Although the majority remanded the case to the district court, the United States Supreme Court again intervened, this time granting the State's petition for writ of certiorari and remanding the case to the Sixth Circuit for further consideration of the petitioner's motion under Gonzalez v. Crosby, — U.S. —, 125 S. Ct. 264 (2005).  In Gonzalez, the Supreme Court held that a motion under Rule 60(b)(6) is not to be treated as a successive habeas petition if it does not assert, or reassert, claims of error in the movant's state conviction.  Id.  As a result of the foregoing, the petitioner's habeas corpus proceeding has remained pending in the federal court system for nearly ten years after he filed his petition.

### Administrative Proceedings

On April 3, 2002, while federal habeas corpus proceedings were ongoing, the petitioner asked the Commissioner of Correction in Tennessee to issue a declaratory order regarding the

---

[2] The motion asserted that the district court erred in concluding that the petitioner's failure to include the prosecutorial misconduct issue in his application for permission to appeal to this Court barred review of the issue in the habeas corpus proceeding.  The motion pointed out that on June 28, 2001, this Court adopted Supreme Court Rule 39, which expressly stated that raising an issue in the application for permission to appeal is not required to exhaust state court review and thus preserve the issue for habeas corpus review.

-3-

"constitutionality, legality, and applicability" of the Tennessee Department of Correction's lethal injection protocol.[3]  The Commissioner denied the request on May 28, 2002.

Thereafter, on July 26, 2002, the petitioner filed the present action challenging the Department of Correction's lethal injection protocol in the Chancery Court for Davidson County under the Administrative Procedures Act.  See Tenn. Code Ann. § 4-5-225 (1998).  The petitioner alleged that the lethal injection protocol, which involves the use of sodium pentothal, pancuronium bromide ("Pavulon"), and potassium chloride, violated the Uniform Administrative Procedures Act, see Tenn. Code Ann. § 4-5-101 et. seq. (1998 & Supp. 2004); violated the Open Meetings Act, see Tenn. Code Ann. § 8-44-104 (2002); is contrary to the Nonlivestock Animal Humane Death Act, see Tenn. Code Ann. § 44-17-301 (2004); requires the unlicensed practice of medicine; violates public policy in Tennessee; is cruel and unusual punishment under the United States and Tennessee constitutions; and violates due process under the United States and Tennessee constitutions.  The State moved to dismiss the non-constitutional allegations for failure to state claims upon which relief could be granted.  See Tenn. R. Civ. P. 12.02(6).

After granting the State's motion to dismiss the non-constitutional claims, the Chancellor held an evidentiary hearing on the constitutional claims.  The evidence presented at the hearing by the petitioner and the State of Tennessee is summarized below.

Ricky Bell, the Warden of the Riverbend Maximum Security Institution where death row inmates are housed, was called to testify by both the petitioner and the State.  He testified that in June of 1998, shortly after the legislature enacted lethal injection as a means of execution,[4] the Commissioner of the Department of Correction appointed a committee to establish a lethal injection protocol.  The committee consisted of Department of Correction officials but no physicians or medical personnel.  The committee met four times between June of 1998 and October of 1998; the committee was not open to the public and did not solicit public feedback with regard to lethal injection.

Bell and the other committee members gathered information from other states regarding the lethal injection procedures, and they met with the United States Bureau of Prisons and prison officials in Indiana and Texas regarding the protocol.  Bell also traveled to Texas to observe an execution carried out through lethal injection.  Bell testified that the committee decided to adopt a lethal injection protocol that included the use of three drugs in the following doses and sequence: five grams of sodium Pentothal, which puts the inmate to sleep quickly; 100 milligrams of Pavulon, which stops the inmate's breathing; and 200 milligrams of potassium chloride, which stops the

---

[3] At that time, the petitioner was facing an execution date of April 10, 2002, which was stayed by the United States Supreme Court when it granted the petitioner's petition for a writ of certiorari.  Abdur'Rahman v. Bell, 535 U.S. 981 (2002).

[4] See Tenn. Code Ann. § 40-23-114 (2003).  Although executions prior to this legislation were to be carried out through electrocution, the new provisions made lethal injection applicable to all inmates on death row except for those who took affirmative steps of choosing electrocution.  Id.

inmate's heart. Bell stated that the number of states using these drugs was "in the 30s," and that the dosages were based on the Texas protocol because that state has performed the most executions in the country. Bell conceded that he has no medical education or expertise with these drugs other than what he learned for the lethal injection process and that he has no specific knowledge regarding the effects of Pavulon.

Bell described the lethal injection process in detail. Bell obtains the drugs from the Special Needs Facility and keeps them in a storage area to which he has the only keys. Before an execution, Bell prepares two sets of seven syringes in the presence of other members of the execution team; each set includes one syringe of sodium Pentothal, two syringes of Pavulon, two syringes of potassium chloride, and two syringes containing saline. The syringes are numbered one through seven and color coded – yellow for sodium Pentothal, black for saline, blue for Pavulon, and red for potassium chloride. The second set of syringes is used only if there has been a problem with the first set.

Bell testified that an "extraction team" of correctional officers takes the inmate from his cell, straps him to a gurney, and rolls him into the death chamber just before a scheduled execution. An "IV team," which consists of two paramedics and one correctional officer, inserts a catheter above the inmate's elbow on both arms. The second catheter is used only if there is a problem with the first. After the catheters are inserted, the IV team members leave the room.

Bell explained that he selects a ranking prison official to serve as executioner; the executioner is not a physician and does not have medical training outside of the lethal injection training process. The executioner remains in a room adjacent to the death chamber. A window between the two rooms allows the executioner to see the inmate throughout the execution process; a camera immediately over the gurney also allows the executioner to "zoom in" and see the catheters. The IV catheters are connected to tubes that extend through a portal in the wall below the window. The color-coded syringes are in the executioner's room. When signaled by Bell, the executioner attaches each syringe and performs a "push" in the following sequence: a syringe of sodium Pentothal, a syringe of saline, two syringes of Pavulon, a syringe of saline, and two syringes of potassium chloride.

Bell stated that the lethal injection protocol contains backup procedures and that practice sessions are conducted monthly. If a paramedic on the IV team is unable to insert an IV catheter, for instance, a physician is on site to perform a "cutdown" procedure, i.e., a procedure in which the physician makes an incision allowing for insertion of the catheter in a larger artery. The decision to use a cutdown procedure as an alternative was based on protocols in other states. Similarly, Bell testified that the preparation of two sets of syringes assures there is an adequate supply of the drugs in the event of a clogged catheter line, vein blockage, or other failure. In such a case, the procedure calls for the executioner to start the syringe sequence from the beginning.

Finally, Bell testified that the lethal injection protocol had been used in the execution of Robert Glen Coe in April of 2000. Coe entered the execution chamber at 1:07 a.m. and the IV

-5-

catheters were inserted by 1:21 a.m. After Bell spoke to the Commissioner to determine that the execution had not been stayed, the lethal injection drugs were injected at 1:32 a.m. Coe was pronounced dead at 1:37 a.m. According to Bell, who witnessed the entire execution, Coe did not appear to be in pain or discomfort after the executioner administered the drugs.

Dr. Mark J. S. Heath, a board certified anesthesiologist and assistant professor of anesthesiology at Columbia University in New York, testified on behalf of the petitioner. Dr. Heath testified that he became interested in the lethal injection process when reading about the drugs used in the federal government's execution of Timothy McVeigh.[5] Dr. Heath thought it was "quite odd" that the federal government's lethal injection protocol included an ultrashort-acting barbiturate (sodium Pentothal) with a long-acting paralyzing drug (Pavulon). Dr. Heath began educating himself on lethal injection protocols throughout the country, and he had testified against the use of certain drugs in cases in Louisiana and Georgia. He testified that Tennessee's lethal injection protocol is flawed in numerous respects.

First, Dr. Heath testified that Tennessee's lethal injection protocol, like that of the federal government and over thirty states, uses sodium Pentothal to induce general anesthesia, Pavulon to induce paralysis of skeletal muscles, and potassium chloride to cause death through cardiac arrest. Dr. Heath explained that Pavulon plays no role in causing death or expediting the lethal injection process. Moreover, because Pavulon does not affect one's involuntary muscles or the nervous system, there are "many problems" with using Pavulon:

> [S]hould for any reason, and there are a number of reasons why this might occur, the Pentothal [is] inadequate to keep them asleep until the potassium kills them, then they would emerge from unconsciousness or experience consciousness while paralyzed, while suffocating and then experience the potassium being injected.

Dr. Heath testified that Pavulon creates "the real risk" of rendering the lethal injection process "unnecessarily inhumane." He explained that as a result of paralysis induced by Pavulon, inmates being executed are unable to move if "discomfort or pain is occurring" and are unable to make "any facial expression" indicating their suffering. Moreover, Dr. Heath noted that Tennessee's protocol lacks instructions or procedures to ensure that inmates are in fact anesthetized from the sodium Pentothal prior to the injection of Pavulon. In sum, Pavulon creates a "chemical veil" that prevents witnesses from seeing or otherwise detecting the inmate's suffering.

Second, Dr. Heath criticized Tennessee's lethal injection protocol for lacking provisions to ensure the proper handling and administering of the three drugs used in the lethal injection process. He stated that the drugs are controlled substances that must be mixed, drawn, and administered in the proper concentration and volume according to complex calculations. Similarly, Dr. Heath

---

[5] Timothy McVeigh was sentenced to death and executed for his role in the 1995 bombing of a federal building in Oklahoma City that killed 165 people. United States v. McVeigh, 153 F.3d 1166 (10th Cir. 1998).

testified that using a series of seven syringes was an "extraordinarily over-complex sequence," that there was no reason to include an injection of saline between the injections of Pavulon and the potassium chloride, and that the failure to label each syringe with the name of the specific drug contained therein was unacceptable.

Third, Dr. Heath criticized Tennessee's lethal injection protocol for lacking safeguards as to the insertion and monitoring of the IV catheter. He explained that the improper insertion of an IV catheter creates the risk of an extra-vascular injection or an infiltration, during which the drugs and fluids are not injected into the vein and are not delivered through the bloodstream. Dr. Heath explained that the IV injection site must be monitored closely not only by sight but also by feeling or palpating the area to discern swelling, puffiness, or leakage; as a result, it is "extremely uncommon" for the person monitoring the IV catheter and injecting the drugs to be in a room separate from the patient.

Similarly, Dr. Heath strongly criticized the Tennessee lethal injection protocol for using the "cutdown" procedure in cases where an IV catheter either cannot be inserted or has failed. He stated that the cutdown procedure is "rarely performed" in the practice of medicine, except in emergency trauma situations where a patient's central and peripheral veins have collapsed. Dr. Heath noted that although the lethal injection protocol provides for a physician to be on site during an execution, the protocol does not contain provisions for obtaining a physician who is experienced in the cutdown procedure. Moreover, in contrast to the cutdown procedure, Dr. Heath testified that a percutaneous technique, in which a needle is used to insert a thin wire and a catheter, is "much more widely used." He further stated that the percutaneous method decreases the risk of catastrophic bleeding, is quicker and easier to perform, and is easier to teach to others.

Dr. Heath conceded that he had never witnessed a lethal injection or consulted in the formulation of a lethal injection protocol. He also acknowledged that the federal government and over thirty states have lethal injection protocols that include sodium Pentothal, Pavulon, and potassium chloride, and that only two states, New Jersey and North Carolina, do not use this combination of drugs for lethal injection. Dr. Heath agreed that an injection of two grams of sodium Pentothal would cause unconsciousness in all but "very rare" cases and that an injection of five grams of sodium Pentothal "would almost certainly be fatal."

Carol Weihrer, president and founder of the Anesthesia Awareness Campaign, also testified on the petitioner's behalf. She stated that in January of 1998, she had surgery to remove an eye while under the effect of a neuromuscular blocking agent and while lacking sufficient anesthesia. As a result, she was aware of what was going on during the surgery, but she could not move or speak. She testified that the ordeal was terrifying and tortuous. She stated that she formed her organization to educate the public and medical practitioners about these issues.

Dr. Dennis Geiser, Chairman of the Department of Large Animal Clinical Sciences at the University of Tennessee College of Veterinary Medicine, also testified on behalf of the petitioner. A doctor of veterinary medicine, Dr. Geiser stated that he was familiar with the drugs used in the

lethal injection process and the effects of each drug. He testified that Pavulon is a neuromuscular blocking agent which paralyzes an animal's diaphragm and causes breathing to cease. He stated that Pavulon, whether used alone or with other drugs, is not acceptable by the American Veterinary Medical Association for animal euthanasia for several reasons:

> [T]he use of Pavulon could potentially produce an inhumane situation as it relates to animals if it's used in an euthanasia protocol, and I think one of the reasons for that is that . . . it does cause respiratory arrest without causing central nervous system depression. . . . And if we cause asphyxiation using the Pavulon, but yet you [cannot] perceive that asphyxiation then this causes inhumane distress and pain for that particular animal. . . . It has no pain relief properties whatsoever and it does produce respiratory relief.

Dr. Geiser acknowledged that he was not a physician, that he had never used Pavulon on a person, and that Pavulon had other surgical uses.

Dr. Bruce Levy, the Chief Medical Examiner for the State of Tennessee and a County Medical Examiner in Davidson County, Tennessee, testified on behalf of the State. Dr. Levy testified that he is board-certified in anatomic pathology, clinical pathology, and forensic pathology. Several years earlier, he had discussed Tennessee's lethal injection protocol and the role of County Medical Examiner with Warden Ricky Bell. He had also reviewed the lethal injection procedures, toured the execution facilities, and spoken to medical examiners throughout the country who had experience with lethal injection.

Dr. Levy testified that sodium Pentothal, Pavulon, and sodium chloride have well-known effects: sodium Pentothal is an ultra-fast acting barbiturate that is used in general anesthesia; Pavulon is a neuromuscular blocking agent that prevents nerve impulses from contracting muscles; and potassium chloride is normally used to increase a patient's potassium level. Dr. Levy testified that an injection of five grams of sodium Pentothal would cause unconsciousness and death, and that a large dose of potassium chloride causes the heart to stop beating. He believed that an inmate given five grams of sodium Pentothal as provided in Tennessee's lethal injection protocol would feel no pain after the injections of Pavulon and potassium chloride. Dr. Levy stated that the inmate's death is caused by a combination of the three drugs and not only by the potassium chloride. He agreed that eliminating Pavulon would not decrease the effectiveness of the lethal injection process.

Dr. Levy testified that the insertion of an IV is normally a routine procedure that can be performed by paramedics. He also testified that a cutdown is a "minor surgical procedure" in which an incision is made before inserting a catheter directly into a large vein. He said that the procedure is still used by physicians.

Finally, Dr. Levy testified that as the medical examiner in Davidson County, Tennessee, he performed the autopsy on Robert Coe, who was executed by lethal injection in 2000.[6] He said that the cause of Coe's death was an "acute intoxication" by the combination of sodium Pentothal, Pavulon, and potassium chloride. He said that, based on the levels of the drugs found in Coe's body, Coe would have been unconscious within seconds of being injected with sodium Pentothal and would have died within five minutes. Coe would not have regained consciousness and would not have experienced any pain or discomfort as a result of any of the three drugs.

Following the hearing, the Chancellor found that the petitioner "failed to demonstrate that Tennessee's method of lethal injection is unconstitutional." Although the Chancellor further found that the State did not establish "any need whatsoever for the injection of Pavulon," she concluded that the lethal injection process was nevertheless "reliable in rendering an inmate unconscious, if not dead, before the paralytical and lethal painful drugs take effect." The Chancellor thus concluded that the petitioner failed to show "that Tennessee's lethal injection method poses a reasonable likelihood of a cruel or inhumane death."

The Court of Appeals affirmed the Chancellor's ruling that Tennessee's lethal injection protocol was not cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution or article I, section 16 of the Tennessee Constitution. The Court of Appeals also affirmed the Chancellor's dismissal of all the remaining non-constitutional claims raised by the petitioner.

We granted this appeal to review these issues.

## CONSTITUTIONAL ISSUES

A constitutional claim that is resolved after an evidentiary hearing generally presents a mixed question of law and fact. See Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004) (ineffective assistance of counsel); Jaco v. State, 120 S.W.3d 828, 830 (Tenn. 2003) (voluntary guilty plea). On appeal, our standard of review is de novo with a presumption of correctness extended only to the lower court's findings of fact. Carpenter, 126 S.W.3d at 886; see also State v. Webb, 750 A.2d 448, 453 (Conn. 2000) (cruel and unusual punishment).

### Cruel and Unusual Punishment

The petitioner argues that Tennessee's lethal injection protocol amounts to cruel and unusual punishment under the Eighth Amendment to the United States Constitution and article I, section 16 of the Tennessee Constitution. He argues that the lethal injection protocol is inconsistent with contemporary standards of decency, that the use of Pavulon with sodium Pentothal and potassium

---

[6] Dr. Levy testified that the death of all prisoners is reported to the medical examiner in the county where the death occurred and that the medical examiner is authorized to order an autopsy on all homicides, regardless of the reason for the homicide.

chloride creates a risk of unnecessary physical and psychological suffering, and that the lethal injection protocol lacks written provisions or other appropriate safeguards and thus may cause unnecessary physical and psychological suffering. The State replies that the lethal injection protocol in Tennessee is the same as the protocol used by over thirty other jurisdictions and by the federal government and that the evidence failed to establish a risk of unnecessary physical or psychological suffering.

Although this Court has recently upheld the use of lethal injection as a constitutionally permissible means of imposing the death penalty, see State v. Robinson, 146 S.W.3d 469, 529 (Tenn. 2004), we have never addressed the issue of whether the specific protocol in Tennessee for executing a death sentence by lethal injection constitutes cruel and unusual punishment. As a result, we begin our analysis by reviewing the relevant constitutional provisions and related authorities.

The Eighth Amendment to the United States Constitution provides that "[e]xcessive bail shall not be required, no excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The language in article I, section 16 of the Tennessee Constitution is very much the same: "That excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Tenn. Const. art. I, § 16.

Nearly one hundred years ago, the United States Supreme Court recognized that the cruel and unusual punishments clause "is not fastened to the obsolete, but may acquire meaning as public opinion becomes enlightened by a humane justice." Weems v. United States, 217 U.S. 349, 378 (1910) (citations omitted). The Court has explained that the Eighth Amendment draws "its meaning from the evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. 86, 100-01 (1958). Indeed, the Court has reasoned that "[b]y protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons." Roper v. Simmons, — U.S. —, 125 S. Ct. 1183, 1190 (2005); see also Estelle v. Gamble, 429 U.S. 97, 102 (1976).

The United States Supreme Court has emphasized three factors in determining whether the severity of punishment imposed for an offense or upon a defendant or a class of defendants constitutes cruel and unusual punishment under the Eighth Amendment: first, whether the punishment for the crime conforms with contemporary standards of decency; second, whether the punishment is grossly disproportionate to the offense; and third, whether the punishment achieves legitimate penological objectives. See Roper, 125 S. Ct. at 1190; Atkins v. Virginia, 536 U.S. 304, 311-12 (2002); Solem v. Helm, 463 U.S. 277, 292 (1983). This Court has also considered similar factors under article I, section 16 of the Tennessee Constitution. See Van Tran v. State, 66 S.W.3d 790, 800 (Tenn. 2001); State v. Black, 815 S.W.2d 166, 189 (Tenn. 1991).

The analysis is quite similar in cases where the challenge is not simply to the *type* of punishment but also to the *method* for carrying out the punishment. See Webb, 750 A.2d at 454 (analyzing whether methods of execution are cruel and unusual). The United States Supreme Court has considered, for instance: (1) whether a method of execution comports with the contemporary

norms and standards of society; (2) whether a method of execution offends the dignity of the prisoner and society; (3) whether a method of execution inflicts unnecessary physical pain; and (4) whether a method of execution inflicts unnecessary psychological suffering. Weems, 217 U.S. at 373. These factors dictate that punishments may not include torture, lingering death, wanton infliction of pain, or like methods. Estelle, 429 U.S. at 102; In re Kemmler, 136 U.S. 436, 447 (1890).

*Contemporary Standards of Decency and Dignity*

In applying this framework, we begin with an analysis of whether the lethal injection protocol comports with contemporary standards of decency. In ascertaining "contemporary standards of decency," a court must look to "objective evidence of how our society views a particular punishment today." Van Tran, 66 S.W.3d at 800. The "most reliable objective evidence" of contemporary standards is most often found in legislation. Id.; see also Roper, 125 S. Ct. at 1190 (holding that contemporary standards reflected in legislation prohibits execution of juveniles); Atkins, 536 U.S. at 311-12 (holding that contemporary standards reflected in legislation prohibits execution of mentally retarded inmates). Accordingly, as the United States Supreme Court has repeatedly shown, "the clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." Id. at 312 (quoting Penry v. Lynaugh, 492 U.S. 302, 331 (1989)).

Here, there is overwhelming evidence that lethal injection, which is commonly thought to be the most humane form of execution, is consistent with contemporary standards of decency. See, e.g., Wheeler v. Commonwealth, 121 S.W.3d 173, 186 (Ky. 2003); Webb, 750 A.2d at 458. Of the thirty-eight states that presently have capital punishment, approximately thirty-seven have legislation adopting lethal injection as the primary means of execution. See Cooper v. Rimmer, 358 F.3d 655, 659 (9th Cir. 2004); Webb, 750 A.2d at 457 (summarizing legislation in thirty-four states). Moreover, no court has ever held that lethal injection is cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution. See Cooper, 358 F.3d at 659; Wheeler, 121 S.W.3d at 186; Webb, 750 A.2d at 457-58.

In addition, the evidence in this case has established that Tennessee's lethal injection protocol is consistent with the overwhelming majority of lethal injection protocols used by other states and the federal government. The evidence revealed, for instance, that the Department of Correction formed a committee for establishing the protocol and then studied the protocols used throughout the country. As a result, the committee based its protocol on the lethal injection protocols used by other states and by the federal government.

The petitioner argues that we should not consider the strong evidence of protocols formulated by Departments of Correction in other states because they were not enacted by legislatures. We disagree. The protocols in every jurisdiction stem from legislation that created lethal injection as a method of execution; moreover, it is equally significant that the protocols have remained intact without legislative revision. Accordingly, we believe that evidence of the lethal injection protocols throughout the country is highly probative of the contemporary standards.

The petitioner also assails the inclusion of Pavulon in Tennessee's lethal injection protocol as being inconsistent with contemporary standards. While the Chancellor correctly observed that the State failed to show a legitimate reason for the use of Pavulon in the lethal injection protocol, the undisputed evidence before the Chancellor was that only two states do not use some combination of sodium Pentothal, Pavulon, and potassium chloride. Moreover, the Chancellor and the Court of Appeals correctly observed that the analysis under the Eighth Amendment of the United States Constitution and article I, section 16 of the Tennessee Constitution does not require consideration of whether other means of execution may be superior in some way or the result of a more updated study. Instead, the lower courts properly focused on the appropriate legal standard and concluded that the use of Pavulon does not violate contemporary standards of decency.

Accordingly, we agree that using Pavulon in the lethal injection protocol does not violate contemporary standards of decency.

*Unnecessary Pain and Suffering*

We next consider whether the lethal injection protocol offends either society or the inmate by the infliction of unnecessary physical or psychological pain and suffering.

The petitioner primarily assails the use of Pavulon in the lethal injection protocol by arguing that its use in combination with sodium Pentothal and potassium chloride creates a risk of unnecessary physical and psychological suffering. Specifically, the petitioner asserts that if an inmate receives an insufficient dose of sodium Pentothal, he or she will not be sedated while undergoing the paralysis caused by Pavulon and the cardiac failure caused by potassium chloride.

The petitioner's arguments, however, are not supported by the evidence in the record. Indeed, although it was undisputed that the injection of Pavulon and potassium chloride would alone cause extreme pain and suffering, all of the medical experts who testified before the Chancellor agreed that a dosage of five grams of sodium Pentothal as required under Tennessee's lethal injection protocol causes nearly immediate unconsciousness and eventually death. Dr. Levy testified that such a dose would cause an inmate to be unconscious in about five seconds and that the inmate would never regain consciousness and would feel no pain prior to dying. Dr. Heath similarly testified that a lesser dosage of two grams of sodium Pentothal would cause unconsciousness in all but "very rare" cases and that a dosage of five grams would "almost certainly cause death."

The evidence regarding the lethal injection execution of Robert Coe in 2000 supported this medical testimony. Dr. Levy testified, for instance, that the cause of Coe's death was an "acute intoxication" by sodium Pentothal, Pavulon, and potassium chloride. He further stated that, based on the levels of the drugs found in Coe's body, Coe would have been unconscious within seconds of being injected with sodium Pentothal and would have died within five minutes. Coe would not have regained consciousness and would not have experienced any pain or discomfort as a result of the three drugs. There was no proof to the contrary.

-12-

The petitioner attempts to bolster his contention as to Pavulon by also asserting that the lethal injection protocol further heightens the risk of unnecessary physical and psychological suffering by, among other things, failing to adequately insert and monitor the inmate's IV catheter, requiring a "cutdown" procedure where an IV catheter cannot be inserted, and failing to ensure the proper handling, labeling, and administering of the drugs.

Again, however, the petitioner's arguments simply are not supported by the evidence in the record. There was no evidence in the record that the procedures followed under the lethal injection protocol have resulted in the problems feared by the petitioner; indeed, the undisputed evidence was that the sole lethal injection carried out in Tennessee, i.e., Robert Coe in 2000, had revealed "no significant difficulties with the process." Likewise, there was no evidence of problems occurring in the more than thirty other state or federal jurisdictions that have used the same or similar protocol on many occasions. In fact, at least one state has rejected nearly identical claims as those raised by the petitioner. Webb, 750 A.2d at 456 (refuting defendant's arguments of "possible" problems in lethal injection and emphasizing Connecticut's adequate safeguards for proper IV insertion and monitoring and the proper administration of the drugs).

In addition, we agree with the Court of Appeals' observation that we cannot judge the lethal injection protocol based solely on speculation as to problems or mistakes that *might* occur. We must instead examine the lethal injection protocol as it exists today. The Supreme Court of Connecticut has reached the same conclusion:

> The defendant's argument is premised on a series of presumptions: that the personnel will not be trained adequately; that the dosage of thiopental sodium ten times the surgical dose will not be sufficient to render the inmate unconscious; and that the agents will not be administered in the proper time and sequence. The evidence, however, supports a conclusion that reasonable steps have been taken to eliminate human error. . . . We conclude . . . that the agents may be administered correctly and effectively, and that the possibility of a 'botched' execution is extremely remote under the protocol.

Webb, 750 A.2d at 456.

Having reached these conclusions, we acknowledge and share the Chancellor's concerns that several issues raised by Dr. Heath's testimony could serve as the basis for future study. In particular, the issue of the need for Pavulon, if any, and the use of an alternative to the cutdown procedure in cases where an IV catheter cannot be inserted are appropriate for additional examination. The evidence showed that the lethal injection protocol in Tennessee was adopted based entirely on what has been done in the past without difficulty in other jurisdictions with very few, if any, modifications. Nonetheless, we recognize that what could be done to update or even improve the protocol is not the appropriate legal inquiry to be undertaken by this or any other reviewing court.

Instead, we must consider only those factors we have reviewed and reach our determination based on the evidence found in the record.

Having done so, we conclude that the petitioner has failed to establish that the lethal injection protocol is cruel and unusual punishment under the United States or Tennessee constitutions.

## Due Process

The petitioner next argues that the lethal injection protocol violates due process under the United States and Tennessee constitutions. He cites as reasons the manner in which the lethal injection protocol was adopted, as well as the risk of unnecessary pain and suffering that the lethal injection protocol engenders. In reply, the State argues that lethal injection was properly enacted as a means of execution by the legislature and that the protocol was properly enacted by the Department of Correction. Tenn. Code Ann. § 40-23-114(d) (2003). The State also argues that the petitioner failed to show any risk of unnecessary pain and suffering in violation of his due process rights.

We begin our analysis with a review of the constitutional provisions regarding due process. The United States Constitution prohibits any state from depriving "any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1. Article I, section 8 of the Tennessee Constitution states, "no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

This Court has stated that "due process of law is the primary and indispensable foundation of individual freedom," and the "basic and essential term in the social compact which defines the rights of the individual and delimits the powers which the state may exercise." State ex rel. Anglin v. Mitchell, 596 S.W.2d 779, 785 (Tenn. 1980) (quoting In re Gault, 387 U.S. 1, 20 (1967)). "As a result of its very important role in our society, due process is not a static legal principle, but, in a free society, it is an advancing standard consisting of those basic rights which are deemed reasonable and right." City of White House v. Whitley, 979 S.W.2d 262, 266 (Tenn. 1998).

Procedural due process requires "fundamentally fair" procedures to be employed whenever a governmental entity acts to deprive a person of a right to or interest in life, liberty or property. See Fuentes v. Shevin, 407 U.S. 67, 80 (1972). Substantive due process, on the other hand, is implicated where an executive agency of government acts in a manner that is (1) arbitrary, irrational or improperly motivated or (2) so egregious that it shocks the conscience. County of Sacramento v. Lewis, 523 U.S. 833, 840 (1998); see also Parks Properties v. Maury County, 70 S.W.3d 735, 744 (Tenn. Ct. App. 2001).

In this case, the petitioner has failed to cite authority or otherwise make a persuasive argument that the adoption of the lethal injection protocol violated procedural due process. Moreover, the evidence before the Chancellor showed that the method of lethal injection was created by the legislature and that the implementation of lethal injection was left to the Department of

-14-

Correction. Tenn. Code Ann. § 40-23-114(c) (2003). Following the legislation, the Department of Correction created a committee, which studied the matter before adopting a lethal injection protocol substantially similar to that used by nearly every other state and the federal government. For the reasons discussed hereafter in this opinion, the Department was not subject to the notice and approval provisions of the Uniform Administrative Procedures Act or any similar statutory requirements. As a result, we conclude that the petitioner has failed to establish any deprivation of procedural due process in the creation of the Tennessee lethal injection protocol.

Similarly, the petitioner has failed to establish a violation of substantive due process. First, as explained above, there is nothing arbitrary, irrational, improper or egregious in the Department of Correction following the legislative mandate to implement lethal injection as a method of punishment. Second, there is nothing arbitrary, irrational, improper or egregious in the manner in which the Department implemented a lethal injection protocol, i.e., by studying the lethal injection protocols of other states and the federal government and by using those protocols as models for the creation of Tennessee's protocol. Finally, as fully explained in our analysis of the cruel and unusual punishment issue, there is no evidence that the Tennessee lethal injection protocol creates an unreasonable risk of unnecessary pain and suffering.

Accordingly, we conclude that the petitioner has failed to demonstrate a violation of either procedural or substantive due process under the United States or Tennessee constitutions.

### Open Courts

The petitioner argues that the lethal injection protocol, and specifically the use of Pavulon, violates his right to have access to the courts and to protect his rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, sections 8, 13, 16, 17, and 19 of the Tennessee Constitution. The State maintains that the petitioner failed to demonstrate that the lethal injection protocol violates his right to access the courts.

The petitioner's principal argument is that the use of Pavulon creates a "chemical veil" through which his attorney or other witnesses to the execution cannot discern his pain and suffering and thus, cannot seek judicial relief to protect him from cruel and unusual punishment. As with the cruel and unusual punishment issue, the petitioner again argues that the pain and suffering may result from an insufficient or improperly administered dose of sodium Pentothal, an insufficient IV catheter connection, a mislabeling or misuse of drugs, or myriad other possibilities.

The petitioner's argument is flawed, however, in that he has failed to show evidence that a scenario involving unnecessary pain and suffering is anything other than speculation. The undisputed evidence instead showed that an injection of five grams of sodium Pentothal under Tennessee's lethal injection protocol causes nearly immediate unconsciousness and is, in fact, fatal. The undisputed evidence further showed that an inmate injected with five grams of sodium Pentothal would remain unconscious and feel no pain through the lethal injection process. Finally, the evidence showed that an overwhelming majority of jurisdictions use a lethal injection protocol with

-15-

the same combination of drugs used in Tennessee. There was no evidence that the other jurisdictions have had any of the potential problems cited by the petitioner. In sum, the petitioner has failed to establish a violation of his right to access to the courts.

## REMAINING ISSUES

The remaining issues on appeal were dismissed by the trial court for the failure to state a claim upon which relief can be granted. Tenn. R. Civ. P. 12.02(6). A Rule 12.02(6) motion tests the legal sufficiency of the complaint and not the strength of the evidence. Riggs v. Burson, 941 S.W.2d 44, 47 (Tenn. 1997). Courts must accept the allegations of fact as true and deny the motion unless it appears that the plaintiff can establish no facts supporting the claim that would warrant relief. Id. On appeal, we must take the factual allegations contained in the complaint as true and review the lower court's legal conclusions de novo without a presumption of correctness. Stein v. Davidson Hotel Co., 945 S.W.2d 714, 716 (Tenn. 1997).

### Uniform Administrative Procedures Act

The petitioner argues that the procedures in the lethal injection protocol were "rules" adopted by the Department of Correction in violation of the Uniform Administrative Procedures Act ("UAPA"). Tenn. Code Ann. § 4- 5-101 et seq (1998 & Supp. 2004). The State responds that the Court of Appeals properly concluded that the lethal injection protocol was not subject to the requirements of the UAPA.

The UAPA requires a state agency in Tennessee to follow uniform procedures when making rules. Tenn. Code Ann. § 4-5-201 et seq (1998 & Supp. 2004). These detailed procedures govern public hearings on the content of proposed rules, the conduct of those hearings, approval of the rules by the Attorney General, filing of the rules with the Secretary of State, and publication in the administrative register. Id.

Under the UAPA, an "agency" refers to a "state board, commission, committee, department, officer, or any such unit of state government authorized or required by any statute or constitutional provision to make rules . . . ." Tenn. Code Ann. § 4-5-102(2). A "rule" is an "agency statement of general applicability that implements or prescribes a law or policy or describes the procedures or practice requirements of any agency . . . ." Tenn. Code Ann. § 4-5-102(10). However, a "rule" does not include "[s]tatements concerning only the internal management of state government and not affecting private rights, privileges or procedures available to the public," Tenn. Code Ann. § 4-5-102(10)(A), nor does a "rule" include "statements concerning inmates of a correctional facility." Tenn. Code Ann. § 4-5-102(10)(G).

As this Court has previously indicated in an unpublished order, the lethal injection protocol is not subject to the requirements of the UAPA for several reasons. Coe v. Sundquist, No. M2000-00897-SC-R9-CV (Tenn. 2000). First, the lethal injection protocol is not a rule as defined by the UAPA. Tenn. Code Ann. § 4-5-102(10). The protocol instead fits squarely within two exceptions

to the meaning of "rule": statements concerning only the internal management of state government and not affecting private rights privileges or procedures available to the public, Tenn. Code Ann. § 4-5-102(10)(A), and statements concerning inmates of a correctional or detention facility, Tenn. Code Ann. § 4-5-102(10)(G).

Second, we have previously held that the Department of Correction's prison disciplinary procedures were not "rules" under the UAPA. Mandela v. Campbell, 978 S.W.2d 531, 534 (Tenn. 1998). In Mandela, we observed that the "legislature has provided the TDOC considerable deference and broad discretionary powers to enable the TDOC to manage its tremendous responsibilities." Id. Moreover, we concluded that the "promulgation requirements of public notice, public hearing, attorney general approval, and filing with the state are simply not realistic requirements for implementing procedures that concern the intricacies and complexities of a prison environment." Id. (citing L'Heureux v. Dept. of Corr., 708 A.2d 549, 553 (R.I. 1998)). We believe that this reasoning is equally appropriate and consistent as applied to the lethal injection protocol.

Finally, we conclude that the petitioner's reliance on Tennessee Code Annotated section 40-21-114(c), which states that "[t]he department of correction is authorized to promulgate necessary rules and regulations to facilitate the implementation of this statute," is not persuasive. This statute does not address the definition of "rules" under the UAPA or the relevant exceptions. Moreover, virtually all other statutes in the Tennessee Code that authorize the promulgation of rules and regulations expressly refer to the UAPA. See Tenn. Code Ann. § 2-5-201 (2003); Tenn. Code Ann. § 4-14-309 (2003); Tenn. Code Ann. § 12-7-205 (1999); Tenn. Code Ann. § 39-17-1360 (2003); Tenn. Code Ann. § 48-101-503 (2002); Tenn. Code Ann. § 56-6-508 (2000); Tenn. Code Ann. § 56-12-220 (2000); and Tenn. Code Ann. § 67-4-1707 (2003), among others. In short, the absence of an express reference to the UAPA in section 40-23-114(c) is entirely consistent with our conclusion that the UAPA is inapplicable.

Accordingly, we conclude that the procedures in the lethal injection protocol were not "rules" adopted by the Department of Correction in violation of the UAPA and that the petitioner is not entitled to relief on this ground.

### Nonlivestock Animal Humane Death Act

The petitioner next argues that the lethal injection protocol violates the Nonlivestock Animal Humane Death Act, which prohibits the use of "a neuromuscular blocking agent," such as Pavulon, in the euthanizing of nonlivestock animals. The State maintains that the Chancellor properly found that the petitioner failed to state a claim upon which relief could be granted and that the Court of Appeals properly affirmed the Chancellor's ruling. See Tenn. R. Civ. P. 12.02(6).

In 2001, the Tennessee legislature enacted the Nonlivestock Humane Death Act to address the issue of euthanizing nonlivestock animals. Tenn. Code Ann. § 44-17-301 et seq (2000 & Supp. 2004). The Act applies to "public and private agencies . . . operated for the collection, care and/or euthanasia of stray, neglected, abandoned or unwanted nonlivestock animals." Tenn. Code Ann.

§ 44-17-302. It prohibits the use of a neuromuscular blocking agent in the euthanasia of a nonlivestock animal. Tenn. Code Ann. § 44-17-303(c). A "nonlivestock animal" is "a pet normally maintained in or near the household or households of its owner or owners, other domesticated animal, previously captured wildlife, an exotic animal, or any other pet . . . ." Tenn. Code Ann. § 39-14-201(3) (2003).

In our view, the lethal injection protocol does not violate this Act for numerous reasons. The plain language of the Act is applicable only to certain public and private agencies set out in section 44-17-302, which group does not include the Department of Correction. The plain language in the statutory definition of a nonlivestock animal as provided in section 39-14-201(3) does not include human beings. Likewise, there is no language in the Act or elsewhere that plainly states or otherwise suggests its applicability to inmates in the Department of Correction. Finally, there is no language in the lethal injection statute or elsewhere that would indicate it is to be construed or interpreted in conjunction with the Nonlivestock Animal Humane Death Act. Tenn. Code Ann. § 40-21-114.

We are constrained against adopting an interpretation of any statute that would lead to absurd results. McClellan v. Bd. of Regents of the State Univ., 921 S.W.2d 684, 689 (Tenn. 1996). The petitioner's interpretation would necessarily result in a conclusion that lethal injections of death row inmates may be carried out only by veterinarians or other technicians described in this Act. We decline to adopt such an interpretation of these statutory provisions.

In short, the petitioner is not entitled to relief on this ground.

### Practice of Medicine and Provision of Healthcare Services

The petitioner next argues that the lethal injection protocol is invalid because it requires medical services to be provided by persons other than licensed physicians and healthcare providers. The State responds that the lethal injection provisions created by statute do not contemplate or require the practice of medicine or the involvement of licensed healthcare providers.

We agree with the Chancellor and the Court of Appeals that the petitioner is not entitled to relief on this issue. The Department of Correction was given the statutory mandate for implementing lethal injection as a means of execution. Tenn. Code Ann. § 40-23-114. The plain language of the statute does not require the involvement of licensed physicians or healthcare workers, nor does it require the practice of medicine. As the Court of Appeals aptly observed, "[e]xtending the licensing requirements to executions by lethal injection would have the practical effect of frustrating the Tennessee General Assembly's considered decision to adopt execution by lethal injection as the primary method for carrying out capital punishment in Tennessee." Although the experience, training, and qualifications of persons involved in the lethal injection process are relevant to cruel and unusual punishment and due process issues, the lethal injection protocol falls outside of licensing statutes applicable to physicians and healthcare providers.

Accordingly, the petitioner is not entitled to relief on this ground.

-18-

**Drug Control Act and Pharmacy Practice Act**

The petitioner also argues that the lethal injection protocol is invalid because it requires the Warden, Ricky Bell, to obtain, mix, and administer a controlled substance in violation of the Drug Control Act of 1989 and the Pharmacy Practice Act of 1996. The State responds that the legislature properly enacted lethal injection as a means of execution and that the Acts relied upon by the petitioner are not applicable to executions by lethal injection.

The Drug Control Act of 1989 indicates that sodium Pentothal is a schedule II controlled substance. Tenn. Code Ann. § 39-17-408(e) (2003). Sodium Pentothal has a high potential for abuse, which can lead to severe dependence. Tenn. Code Ann. § 39-17-407(1). As a result, sodium Pentothal may only be dispensed by written prescription or by a practitioner directly to the user of the controlled substance. Tenn. Code Ann. § 39-17-402(7). The Pharmacy Practice Act requires that persons who prescribe or dispense sodium Pentothal or other controlled substances comply with annual registration requirements. Tenn. Code Ann. § 53-11-302(a) (1999).

We begin by emphasizing the broad statutory authority given to the Department of Correction to implement lethal injection as the primary means of execution. Tenn. Code Ann. § 40-23-114. Nothing in these provisions is subject to the provisions of the Drug Control Act or the Pharmacy Control Act. Indeed, reading any conditions or restrictions into the lethal injection provisions would risk frustrating the Tennessee General Assembly's considered decision to adopt execution by lethal injection as the primary method of execution in Tennessee.

In addition, the Drug Control Act and the Pharmacy Practice Act were designed to prevent the illegal sale or distribution of controlled substances and to provide a system for drug abuse control. These purposes would not be served or advanced by a strained interpretation making them applicable to the lethal injection statutes or to the lethal injection protocol.

As a result, the petitioner is not entitled to relief on this ground.

**CONCLUSION**

After our review of the record and applicable authority, we conclude that the lethal injection protocol in Tennessee, which includes intravenous injections of sodium Pentothal, pancuronium bromide, and potassium chloride, (1) does not violate the Eighth Amendment to the United States Constitution or article I, section 16 of the Tennessee Constitution, (2) does not violate due process provisions under the United States or Tennessee Constitutions, (3) does not deny access to the courts in violation of the United States or Tennessee Constitutions, (4) does not violate the Uniform Administrative Procedures Act, (5) does not violate the Nonlivestock Animal Humane Death Act, (6) does not violate provisions governing the practice of medicine and provision of healthcare services, and (7) does not violate the Drug Control Act or Pharmacy Practice Act. Accordingly, we affirm the judgment of the Court of Appeals. It appearing that the petitioner is indigent, costs of this appeal are taxed to the State.

_____
E. RILEY ANDERSON, CHIEF JUSTICE