Thomas C. BOWLING, Ralph Baze and Brian Keith Moore, Appellants,

v.

KENTUCKY DEPARTMENT OF CORRECTIONS, Appellee.

No. 2007–SC–000021–MR.

Supreme Court of Kentucky.

Nov. 25, 2009.

As Corrected Jan. 4, 2010.

See also, *Baze v. Rees,* 217 S.W.3d 207; *Baze v. Rees,*

553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420.

David Michael Barron, Department of Public Advocacy, Frankfort, KY, John Anthony Palombi, Montgomery, AL, Counsel for Appellants, Thomas C. Bowling, Ralph Baze and Brian Keith Moore.

John C. Cummings, Jeffrey Thomas Middendorf, Justice and Public Safety Cabinet, Office of Legal Services, Frankfort, KY, Stephen D. Lynn, Justice and Public Safety Cabinet, Office of Legal Ser-

vices, Richmond, KY, Counsel for Appellee, Kentucky Department of Corrections.

Opinion of the Court by Justice ABRAMSON.

Appellants Bowling and Baze were convicted of murder and sentenced to death in 1991 and 1994, respectively. Each has pursued and exhausted all direct appeals and collateral attacks in the state courts and, jointly, they prosecuted a declaratory judgment action challenging Kentucky's lethal injection protocol on several grounds including the prohibition on cruel and unusual punishment set forth in the Eighth Amendment of the U.S. Constitution and Section 17 of the Kentucky Constitution. That declaratory judgment action prompted a seven-day bench trial in the circuit court, with Appellants' constitutional arguments ultimately being rejected by both this Court in *Baze v. Rees,* 217 S.W.3d 207 (Ky.2006) and the United States Supreme Court in *Baze v. Rees,* 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008). In this second declaratory judgment action, those Appellants challenge the same lethal injection protocol but this time they contend that it is unenforceable because it was not properly adopted as an administrative regulation in accordance with Kentucky's Administrative Procedure Act (APA). While unquestionably "death is different", the principles of *res judicata* are no less applicable to capital defendants than other parties who pursue relief in our justice system. A declaratory judgment action is the appropriate means of challenging implementation of a defendant's death sentence, given the necessity of joining the Department of Corrections which is not a party to the criminal action, but piecemeal litigation through successive actions is not allowed. Simply put, Appellants Bowling and Baze were required to join all claims regarding implementation of their sentences of execution in their original declaratory judgment action, and they are precluded as a matter of law from reserving arguments for subsequent actions. Accordingly, *res judicata* precludes consideration of Bowling and Baze's second declaratory action.

Appellant Moore stands in a different posture before this Court because this is his first declaratory judgment action, rendering *res judicata* inapplicable to his Administrative Procedures Act claim. Having reviewed the applicable law, it is apparent that the lethal injection protocol implements KRS 431.220, Kentucky's lethal injection statute and, further, that significant portions of the protocol are not matters of internal management for the Department but rather statements of general applicability and policy which affect private rights. Pursuant to KRS 13A.100, the Kentucky General Assembly has required that such portions of the protocol be adopted as an administrative regulation. Contrary to the Department's contention, it is not prohibited by statute from adopting regulations to implement KRS 431.220. Notably, the Franklin Circuit Court concluded that the thorough examination of Kentucky's death penalty protocol in the seven-day bench trial held in Baze and Bowling's first declaratory judgment action (*Baze/Bowling I*), a proceeding in which approximately 20 witnesses, including several experts, were called by both sides, was a sufficient public hearing and thus the current protocol need not be formally adopted as an administrative regulation. While the trial was certainly an extensive public vetting of the protocol, this Court cannot ignore the publication and public hearing requirements set forth in Kentucky statutes. Thus, the Department must proceed pursuant to KRS Chapter 13A to adopt as an administrative regulation all portions of the protocol implementing the lethal injection statute except those involving purely internal matters as discussed herein.

## RELEVANT FACTS AND PROCEDURAL BACKGROUND

The three individual appellants in this case, Thomas Bowling, Ralph Baze, and Brian Keith Moore, were each previously convicted of murder and sentenced to death. Bowling was convicted and sentenced to death for the 1990 murders of a husband and wife as they were parked in their car outside their dry cleaning business in Lexington. *Bowling v. Commonwealth,* 873 S.W.2d 175 (Ky.1993). Baze was convicted and sentenced to death for the 1992 murders of two police officers who were attempting to serve five fugitive warrants on him in Powell County. *Baze v. Commonwealth,* 965 S.W.2d 817 (Ky. 1997). Lastly, Moore was convicted and sentenced to death for the 1979 kidnapping and murder of a 77 year-old man who was leaving an A&P grocery store in Louisville. *Moore v. Commonwealth,* 771 S.W.2d 34 (Ky.1988). As noted above, Bowling and Baze filed *Baze/Bowling I* in August 2004, a declaratory judgment action challenging the lethal injection protocol as a method of execution on several, primarily constitutional, grounds. Moore, however, has not previously challenged the implementation of his death penalty in a declaratory judgment action.

In 1998, the Kentucky General Assembly enacted KRS 431.220, which recognized lethal injection as "the only method of execution in this Commonwealth." [1] Although this statute does not specify the substances to be used or the procedures to be followed in implementing the lethal injection, the Kentucky Department of Corrections ("the Department") issued a two-page Policy (Corrections Policy and Procedure 9.5) on June 3, 2005, which briefly outlined three procedures to be followed for an execution: the place of the inmate's confinement, the pre-execution procedures, and the responsibilities of the warden during "death watch" and execution. The Department has also written a lethal injection protocol detailing the specific procedures to be followed during an execution, but generally has refused to promulgate this protocol as an administrative regulation or disclose it to the public, arguing that the protocol is-internal in nature and is not subject to the requirements of Kentucky's Administrative Procedures Act. In *Baze/Bowling I,* significant parts of the protocol became public including the drugs administered, dosage of each, qualifications of personnel administering the drugs and measures available for resuscitation of life in the event of a stay of execution. The protocol was addressed at length by the U.S. Supreme Court. *See Baze v. Rees,* 553 U.S. at ———, 128 S.Ct. at 1527–1529, 170 L.Ed.2d at 429–430.

Bowling, Baze and Moore (collectively "Appellants") filed this declaratory judgment action in Franklin Circuit Court requesting that the Department be enjoined from carrying out any executions until it promulgates the lethal injection protocol used to implement KRS 431.220 in accordance with Kentucky's Administrative Procedures Act. On May 26, 2006, the Department filed a motion to dismiss the complaint, while Appellants subsequently filed a motion for summary judgment. After hearing arguments on these motions, on November 30, 2006, the circuit court entered an order finding that KRS 13A.100 required the lethal injection protocol to be promulgated, granting Appellants' summary judgment motion, and ordering the Department to promulgate its protocol pursuant to the procedures set out in the Administrative Procedures Act.

1. KRS 431.220(b) states that prisoners who received the death penalty prior to March 31, 1998, shall choose either the lethal injection method of execution or the electrocution method.

Following the entry of this order, the Department moved to alter, amend, or vacate the November 30, 2006 Order pursuant to Kentucky Rule of Civil Procedure (CR) 59.05, arguing primarily that its protocol had already been provided repeatedly to the public and that the portions of the protocol not disclosed set out internal procedures only affecting the Department's personnel. The trial court agreed, and on December 27, 2006, vacated its November 30 Order because it contained "manifest errors of law." Appellants now urge this Court to vacate the trial court's December 27, 2006 Order and reinstate its original order granting the motion for summary judgment. Appellants advance three bases for a reversal of the trial court's order: the Department did not present any new arguments to the trial court to justify its decision to grant the CR 59.05 motion; the trial court's reasons for granting the CR 59.05 motion were insufficient; and lastly, Kentucky's Administrative Procedure Act requires the Department to adopt regulations for carrying out lethal injections.

Following briefing on the issues raised by Appellants, this Court in a June 19, 2008 Order directed the parties to address various procedural matters including the effect of *res judicata* and claim preclusion or splitting of causes of action on the pending matter and the effect, if any, of a civil action on the execution of a criminal judgment. Appellants' arguments on appeal and the issues raised in this Court's June 19, 2008 Order were the subject of oral arguments on October 16, 2008.

## ANALYSIS

### I. The Trial Court Did Not Abuse its Discretion when It Vacated Its Original Judgment and Entered a New Judgment Pursuant to CR 59.05.

CR 59.05 authorizes the trial court to "alter or amend a judgment, or to vacate a judgment and enter a new one" on a motion properly filed by a party within ten days after entry of a final judgment. Recognizing the scope of the power accorded trial courts by CR 59.05, this Court has stated that "a trial court has 'unlimited power to amend and alter its own judgments.'" *Gullion v. Gullion*, 163 S.W.3d 888, 891–92 (Ky.2005) *citing Henry Clay Mining Co. v. V & V Min. Co.*, 742 S.W.2d 566 (Ky.1987). In *Gullion*, we cited favorably the four grounds recognized by the federal courts in construing the federal counterpart, Federal Rule of Civil Procedure 59(e):

> There are four basic grounds upon which a Rule 59(e) motion may be granted. First, the movant may demonstrate that the motion is necessary to correct manifest errors of law or fact upon which the judgment is based. Second, the motion may be granted so that the moving party may present newly discovered or previously unavailable evidence. Third, the motion will be granted if necessary to prevent manifest injustice. Serious misconduct of counsel may justify relief under this theory. Fourth, a Rule 59(e) motion may be justified by an intervening change in controlling law.

163 S.W.3d at 893 *citing* FEDERAL PRACTICE AND PROCEDURE § 2810.1. A trial judge's ruling pursuant to CR 59.05 is reviewed by an appellate court under the abuse of discretion standard. *Gullion*, 163 S.W.3d at 892.

In its December 27, 2006 Order, the trial court in this case cited the relevant standard from *Gullion* and then concluded that "after further review of the applicable statutes and an attempt to harmonize those statutes" the original Order dated November 30, 2006 contained "manifest errors of law." The trial court proceeded to outline

its conclusions that the lethal injection protocol was an issue of internal management; KRS 431.220 does not contain a directive for the Department to establish regulations to implement lethal injection; the current lethal injection protocol is known to the public by virtue of the *Baze/Bowling I* litigation; and practical considerations militate against the use of administrative regulations to develop an execution protocol. The trial court's five pages of analysis displaced a one sentence finding in the November 30 Order: "KRS 13A.100 requires the Department of Corrections to promulgate rules to implement KRS 431.220, and KRS 13A.120 does not exempt the Department from rulemaking in this case." After vacating the November 30 Order, the trial court denied Appellants' motion for summary judgment and granted the Department's motion to dismiss.

Plainly, the trial court was authorized to vacate its prior order upon its own conclusion that it contained "manifest errors of law." Although this Court is partially reversing the December 27, 2006 Order, there was no abuse of discretion by the trial court in its decision to vacate the prior order granting Appellants' summary judgment. Accordingly, the December 27, 2006 Order was properly entered and is properly before this Court for review.

## II. A Declaratory Judgment Action is the Appropriate Vehicle for Raising the Appellants' Administrative Procedure Act Claim

In a June 19, 2008 Order, this Court *sua sponte* asked the parties to file supplemental briefs addressing the related issues of *res judicata*, claim preclusion and the rule against splitting causes of action and whether "a civil action, declaratory or otherwise, is the appropriate procedural vehicle for raising the type of challenges brought by the Appellants." *Baze/Bowling I* implicitly recognized what we now expressly hold, namely that a single declaratory judgment action pursuant to KRS 418.040 and the civil rules is the appropriate vehicle for determination of all issues regarding implementation of the death penalty which are not cognizable in a defendant's criminal action.

KRS 418.040 provides

> In any action in a court of record of this Commonwealth having general jurisdiction wherein it is made to appear that an actual controversy exists, the plaintiff may ask for a declaration of rights, either alone or with other relief; and the court may make a binding declaration of rights, whether or not consequential relief is or could be asked.

The declaratory judgment act is to be liberally interpreted and administered and is intended to make the courts "more serviceable to the people by way of settling controversies, and affording relief from uncertainty and insecurity with respect to rights, duties and relations...." KRS 418.080; *Continental Ins. Co. v. Riggs*, 277 Ky. 361, 126 S.W.2d 853 (1939). Recently in *Mammoth Medical v. Bunnell*, 265 S.W.3d 205 (Ky.2008), we noted that although the scope of KRS Chapter 418, "Declaratory Judgments"

> is liberal and wide, there are, however, limits. Declaratory judgment does not fit every occasion and does not replace the existing system of remedies and actions. For example, an action for a declaratory judgment cannot be instituted to secure a determination of substantive rights involved in a pending suit. *Gibbs v. Tyree*, 287 Ky. 656, 154 S.W.2d 732, 733 (1941).

Moreover, declaratory relief is not appropriate "where a special statute is clearly intended to provide an exclusive remedy." *Iroquois Post No. 229 v. City of Louisville*, 279 S.W.2d 13, 14 (Ky.1955). Finally, CR

57 provides that "the procedure for obtaining a declaratory judgment pursuant to statute shall be in accordance with these rules...."

Appellants correctly note that there is no statute providing an exclusive remedy for addressing their APA claim or for that matter any other challenge to the lethal injection protocol which would involve the Department. Clearly "an actual controversy" existed between Appellants and the Department regarding the implementation of the death penalty through lethal injection and, as we implicitly recognized in *Baze/Bowling I,* a declaratory judgment action is the appropriate vehicle for challenges of the type raised by Appellants. *Baze,* 217 S.W.3d at 209–210. The availability of a declaratory action does not, however, mean that multiple declaratory actions may be filed *seriatim* challenging implementation of the death penalty on selected grounds. When a capital defendant files a declaratory judgment action, he must join all claims then available to him with regard to the implementation of his judgment because *res judicata* will apply full force to bar successive declaratory judgment actions.

### III. *Res Judicata* is Applicable to Bowling and Baze's Administrative Procedure Act Claim and Bars Their Second Declaratory Judgment Action

Appellants responded to the June 19, 2008 Order directing supplemental briefing with a contention that *res judicata* and its related doctrines of claim preclusion and the rule against splitting causes of action should have no bearing on this case because, as affirmative defenses pursuant to CR 8.03, those matters were waived when the Department failed to raise them in the first responsive pleading. Certainly, as a general rule, failure to assert timely an affirmative defense waives that defense and precludes its consideration by the trial court and this Court. *Watts v. K, S & H,* 957 S.W.2d 233 (Ky. 1997). Nevertheless, this rule does not preclude courts from raising the issue of *res judicata* or its related doctrines *sua sponte* in a declaratory judgment action. KRS 418.065 recognizes the broad rights accorded courts in declaratory judgment actions:

> The court may refuse to exercise the power to declare rights, duties or other legal relations in any case where a decision under it would not terminate the uncertainty or controversy which gave rise to the action, or in any case where the declaration or construction is not necessary or proper at the time under all the circumstances. The appellate court in its consideration of the case, shall not be confined to errors alleged or apparent in the record. When, in its opinion, further pleadings or proof is necessary to a final and correct decision of the matters involved, or that should be involved, it shall remand the case for that purpose; or if in its opinion the action is prematurely brought, or where a ruling in the appellate court is not considered necessary or proper at the time under all the circumstances, it may direct a dismissal without prejudice in the lower court.

The first sentence of this statute allows the trial court to decline to exercise its jurisdiction when "it is not necessary or proper at the time under all the circumstances," a firm basis for invoking *sua sponte* an overlooked legal doctrine such as *res judicata.* The second sentence provides that appellate courts "shall not be confined to errors alleged or apparent in the record" and, thus, gives appellate courts similar discretion to apply controlling law regardless of whether it has been raised by the litigants or addressed by the

trial court in a declaratory judgment action. *Rea v. Gallatin County Fiscal Court,* 422 S.W.2d 134 (Ky.1967). These specific provisions applicable only in declaratory judgment actions should not be viewed as a judicial safety net, relieving litigants of the need to consider carefully their responsive pleadings, but they indisputably allow both trial and appellate courts to reach those issues deemed necessary for proper resolution of a declaratory judgment action. Accordingly, if otherwise relevant, *res judicata* may be applied in a declaratory judgment action despite a failure to raise the defense affirmatively in a responsive pleading. Finally, there is nothing unreasonable about a court raising such potentially dispositive issues when the parties, as here, have been given a full opportunity to address those issues, through briefs and oral arguments.

Substantively, *res judicata* applies to bar consideration of a claim that was, or could have been, brought in prior litigation between the parties. This "elementary" rule has been long-honored in Kentucky jurisprudence.

> The rule is elementary that, when a matter is in litigation, parties are required to bring forward their whole case; and 'the plea of *res judicata* applies not only to the points upon which the court was required by the parties to form an opinion and pronounce judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time.' *Davis v. McCorkle,* 77 Ky. [14 Bush] 746 (1879); *Williams v. Rogers,* 77 Ky. [14 Bush] 776 (1879); *Hardwicke v. Young,* [110 Ky. 504] 62 S.W. 10 (1901).

*Combs v. Prestonsburg Water Co.,* 260 Ky. 169, 84 S.W.2d 15, 18 (1935). Drawing on these ancient cases, the *Combs* court concluded "the rule that forbids parties from asserting rights or defenses by sporadic piecemeal precludes them from asserting again anything incident to, and necessarily connected with, the subject-matter of the former litigation which might have properly been interposed ... therein." *Id.*

In an effort to avoid the *res judicata* bar, Appellants note a recent formulation of the rule wherein this Court stated that when a plaintiff "sue[s] a defendant in regard to a single transaction or event, [that plaintiff] must raise all claims arising from that transaction or event." *Watts, supra,* 957 S.W.2d at 236. Focusing on the term "transaction", Appellants maintain that *Baze/Bowling I* was about the actual implementation of the lethal injection protocol and its constitutionality while this litigation involves a different "transaction", namely the manner of the adoption of the protocol by the Department. Appellants' distinction is purely artificial. The transaction at issue here, for each of the Appellants, is the implementation of his death sentence and any and all claims available to him to challenge that implementation on whatever grounds must be brought in the first action or be forever barred by *res judicata.* As to Appellants Bowling and Baze, *Baze/Bowling I* was their first action and their Administrative Procedures Act claim, clearly available to them at the time, should have been included in that action. *Res judicata* bars consideration of this, the second declaratory judgment action, filed by those two Appellants. Appellant Brian Moore has not previously filed an action challenging the implementation of his death sentence and consequently his APA claim is cognizable.

## IV. The Lethal Injection Protocol Must Be Promulgated as an Administrative Regulation

The general matters for which an administrative body in the Executive

Branch of our government, such as the Department, must adopt administrative regulations are identified in KRS 13A.100 entitled "Matters Which Shall Be Prescribed by Administrative Regulations." The part of the statute pertinent to this case provides:

> Subject to limitations in applicable statutes, any administrative body which is empowered to promulgate administrative regulations shall, by administrative regulation prescribe, consistent with applicable statutes:
>
> (1) Each statement of general applicability, policy, procedure, memorandum, or other form of action that implements; interprets; prescribes law or policy; describes the organization, procedure, or practice requirements of any administrative body; or affects private rights or procedures available to the public;

KRS 13A.100 (1). Because the semi-colons may cause some confusion, a more helpful reflection of the legislative intent is the definition of "administrative regulation". KRS 13A.010(2) provides in relevant part:

> (2) "Administrative regulation" means each statement of general applicability promulgated by an administrative body that implements, interprets, or prescribes law or policy, or describes the organization, procedure, or practice requirements of any administrative body. The term includes an existing administrative regulation, a new administrative regulation, an emergency administrative regulation, an administrative regulation in contemplation of a statute, the amendment or repeal of an existing administrative regulation, but does not include:
>
> (a) Statements concerning only the internal management of an administrative body and not affecting private rights or procedures available to the public;

The Department is clearly "empowered to promulgate administrative regulations," KRS 13A.100, as reflected in numerous statutes where the Department itself or through its head, the Secretary of the Justice and Public Safety Cabinet, is specifically directed to adopt administrative regulations. The Department is authorized by KRS 197.020 to adopt regulations regarding the official conduct of Department personnel and the "government of the prisoners in their deportment and conduct." The Secretary is given broad authority in KRS 196.035 to promulgate administrative regulations he deems "necessary or suitable for the proper administration of the functions of the cabinet or any division in the cabinet." In fact, the current volumes of the Kentucky Administrative Register contain approximately 70 pages of regulations promulgated by the Department addressing such matters as how frequently jail inmates' sheets and pillowcases shall be cleaned, 501 KAR 3:080, and the level of lighting in specific areas of a jail, 501 KAR 3:050, Section 6. In 501 KAR 6:020, Section 1, various Corrections Policies and Procedures are incorporated by reference, including Corrections Policy and Procedure 9.5 (CPP 9.5) discussed above pertaining to "Execution" as well as policies regarding the "Nutritional Adequacy of Inmate Diet"; "Hair, Grooming and ID Card Standards" and "Inmate Packages." The preamble to this particular regulation notes that the administrative regulation is to "comply with the accreditation standards of the American Correctional Association."

Despite the fact that portions of the Department's policy regarding execution have been promulgated as a regulation, the Department maintains and the circuit court concluded that the lethal injection procedures are "matters of internal management ... not affecting private rights" as referenced in KRS 13A.010(2)(a). As

for CPP 9.5, which was clearly adopted as an administrative regulation, the Department characterizes it as establishing the public components of the execution process including procedures for attendance by the public and coordination of media activities. The Department's position does not withstand careful scrutiny.

First, it is apparent that the lethal injection protocol is solely for the purpose of implementing the death penalty provided for by the General Assembly in KRS 431.220. This alone brings it within the ambit of KRS 13A.100 (1) and supports its promulgation as a regulation.[2] Moreover, the "private rights" of those individuals being executed by the Commonwealth are invariably affected by the manner in which the lethal injection is administered, again supporting promulgation. KRS 13A.100(1); KRS 13A.010(2)(a). Finally, the Department's own CPP 9.5 belies any suggestion that the execution protocol is a matter of internal management which should not be promulgated as an administrative regulation. CPP 9.5 addresses where the inmate shall be housed in the hours prior to execution; the presence of both an attorney from the Department's legal office and a public information officer to assist the warden with legal and media matters respectively; and the responsibilities of the warden during the "death watch and execution" including the necessity of designating a deputy warden to oversee the operation of the institution until the warden's execution responsibilities conclude. Contrary to the Department's position, these specific matters extend well-beyond the public components of the execution process and, by adopting this policy as a regulation, the Department certainly claimed no right to prevent its disclosure on grounds of "internal management."

Maryland's highest court recently addressed whether that state's administrative procedure act required Maryland's lethal injection protocol to be adopted as a regulation. *Evans v. State,* 396 Md. 256, 914 A.2d 25 (2006). The Maryland Department of Corrections (DOC) contended the protocol did not have general application, concerned only the DOC's internal management and did not affect the rights of the public. The court rejected all three contentions beginning with the argument that the Execution Operations Manual (EOM) was not a generally applicable policy:

> (T)here can be no legitimate doubt that the portions of the EOM that govern the method of and procedure for administering the lethal injection have general application and future effect, were adopted to detail or carry out a law that DOC administers, and govern the procedure of DOC. They have general application and future effect because they comprehensively govern the manner in which every death sentence is implemented. Unquestionably, they were adopted, and, indeed, it is their sole purpose and function, to carry out the mandates of CS §§ 3–905 and 3–906 and add details to the procedure that are unaddressed by the statute. They clearly are within the ambit of SG § 10–101(g)(1) [the Maryland code provision defining an administrative regulation.]

914 A.2d at 78. As for the internal management argument, the Maryland court

2. Specifically, KRS 13A.100(1) provides that an authorized body "shall, by administrative regulation prescribe, consistent with applicable statutes: (1) Each statement of general applicability, policy, procedure, memorandum, or other form of action that implements ... law or policy...." The dissent does not acknowledge this statute, bypassing the legislature's directive on administrative regulations to focus solely on the "private rights or procedures" language of KRS 13A.010(2)(a).

noted that such matters are those "that are purely of concern to the agency and its staff." *Id.* at 79 *citing Massey v. Dept. of Public Safety and Correctional Services*, 389 Md. 496, 520, 886 A.2d 585, 599 (2005). The operative test bears particular attention:

> The real test of whether a DOC Directive (or other policy statement) is exempt from the APA requirements because it concerns only the internal management of the agency and does not affect public rights is whether, given the nature and impact of the Directive, the Legislature intended that the agency be free to adopt, change, or abrogate the Directive at will, without any public input or legislative review.

914 A.2d at 79. Applying this test, the *Evans* Court concluded that the Maryland legislature never intended to leave to the DOC, without any oversight, "unbridled authority to determine and then change at will, as a matter of internal management, how (the death penalty) statute is to be implemented." *Id.* at 80. In closing, the Maryland Court of Appeals concluded that decisions regarding the drugs employed, the manner of their administration and similar issues affect "not only the inmates and the correctional personnel, but the witnesses allowed to observe the execution and the public generally, through its perception of the process." *Id.* Ultimately, the *Evans* Court declared the challenged execution protocol ineffective and unusable until adopted in accordance with Maryland's administrative procedures act.

The Supreme Court of Tennessee reached a contrary conclusion regarding whether that state's corrections department had to adopt its lethal injection protocol as a rule in conformity with Tennessee's Uniform Administrative Procedures Act (UAPA). In *Abdur'Rahman v. Bredesen*, 181 S.W.3d 292 (Tenn.2005) the Court began by noting the protocol did not fit the definition of a "rule".

> First, the lethal injection protocol is not a rule as defined by the UAPA. Tenn.Code Ann. § 4–5–102(10). The protocol instead fits squarely within two exceptions to the meaning of "rule": statements concerning only the internal management of state government and not affecting private rights privileges or procedures available to the public, Tenn. Code Ann. § 4–5–102(10)(A), and statements concerning inmates of a correctional or detention facility, Tenn.Code Ann. § 4–5–102(10)(G).

181 S.W.3d at 311–12. Second, the Court concluded that the legislature had granted the corrections department broad discretionary powers and that the public notice, public hearing and other requirements of the UAPA were " 'simply not realistic requirements for implementing procedures that concern the intricacies and complexities of the prison environment.' " *Id.* at 312 (citation omitted). Finally, and somewhat curiously, even though the Tennessee statute regarding capital punishment generally, and the lethal injection method specifically, authorized the corrections department to promulgate "necessary rules and regulations" to implement it, the Tennessee Supreme Court noted that the statute did not expressly reference the UAPA, thereby supporting the conclusion that the UAPA was inapplicable.

Although the issue before this Court is ultimately one of construction of Kentucky statutes, *Evans* is instructive as to the limitations of the "internal management" exception. Like Maryland's highest court, this Court finds that the lethal injection protocol is not an issue "purely of concern" to the Department and its staff. Nor is there any basis for concluding that the Kentucky General Assembly intended for the Department to be able to modify at

will, without any oversight, the manner in which the Commonwealth's most serious punishment is meted out. As for the Tennessee Supreme Court's contrary conclusion, Kentucky's Administrative Procedures Act does not have an exception on which that Court relied, *i.e.* the exception for "statements concerning inmates of a correctional or detention facility." Moreover, to the extent the Tennessee Court relied on the "internal management" exception, which Kentucky law does have, the Court rather summarily cited it without any attempt to explain how implementation of the death penalty qualifies as a matter of internal corrections department management. In short, nothing in *Abdur'Rahman* persuades us that the Kentucky Administrative Procedures Act dictates a similar conclusion.[3]

Finally, the Department maintains that it is prohibited from adopting regulations to implement the lethal injection statute because KRS 13A.120 (1)(a) states an administrative body "may promulgate administrative regulations to implement a statute only when the act of the General Assembly creating or amending the statute specifically authorizes the promulgation of administrative regulations" or such regulations are required by federal law. This statute is admittedly somewhat perplexing because it appears to contradict KRS 13A.100 which, as noted above, provides that

> [s]ubject to limitations in applicable statutes, any administrative body which is empowered to promulgate administrative regulations shall, by administrative regulation prescribe, consistent with applicable statutes:
>
> (1) Each statement of general applicability, policy, procedure, memorandum, or other form of action that implements; interprets; prescribes law or policy; describes the organization, procedure, or practice requirements of any administrative body; or affects private rights or procedures available to the public.

At first glance, this section's broad mandate that authorized agencies shall prescribe regulations for, among other things, policies and procedures affecting private rights, seems at odds with KRS 13A.120's requirement that statutes not be implemented by regulation unless the regulation is specifically authorized by the statute. The conflict, however, is resolvable by application of traditional statutory construction principles.

In construing these statutes our goal, of course, is to give effect to the intent of the General Assembly, and we

3. Less than sixteen months following *Abdur'Rahman*, Tennessee Governor Phil Bredesen, finding a review had "highlighted deficiencies in the written procedures intended to insure that all legal executions will continue to be carried out appropriately" and that "administration of the death penalty in a constitutional and appropriate manner is a responsibility of the highest importance," revoked all of Tennessee's lethal injection and electrocution protocols. He directed the Commissioner of Corrections to initiate a comprehensive review of the protocols and best practices in other states and then to establish new protocols and procedures for administering death sentences. State of Tennessee, Executive Order by the Governor No. 43 (Feb. 1, 2007). In *Harbison v. Little*, 571 F.3d 531 (6th Cir.2009) the U.S. Court of Appeals for the Sixth Circuit noted that the Commissioner appointed a committee which formulated a revised protocol. The committee met numerous times and held a public hearing before issuing its findings, *Workman v. Bredesen*, 486 F.3d 896, 902 (6th Cir.2007), which are set forth as an Appendix to the *Workman* opinion. *See* 486 F.3d at 913–921. Thus, following *Abdur'Rahman*, Tennessee's Governor accomplished through executive order the review and public hearing components which would have occurred had the Tennessee Supreme Court ruled in the manner that this Court is ruling today.

derive that intent, if at all possible, from the plain meaning of the language the General Assembly chose. We presume, in a case such as this one of related statutes, that the General Assembly intended for the statutes to be construed together and for both to have meaning. We also presume that the General Assembly did not intend an absurd result or an unconstitutional one. *King Drugs, Inc. v. Commonwealth of Kentucky, Revenue Cabinet,* 250 S.W.3d 643, 645 (Ky.2008); *Mullins v. Commonwealth,* 956 S.W.2d 210 (Ky.1997). These statutes may be harmonized by noting that KRS 13A.120 provides for when regulation is permitted while KRS 13A.100 provides for when regulation is required.[4]

First, KRS 13A.120 limits regulatory authority by requiring every assertion of such authority to be justified by, and to be an implementation of, a statute expressly granting such authority. It does not require, as the Department maintains, that every statute the agency might be called upon to interpret and implement include the regulatory grant. That would be an impossible task for the General Assembly and would render meaningless in part the many statutes establishing agencies and granting general regulatory authority, which is the General Assembly's usual approach to that task. The Department's construction would also render a host of Kentucky regulations promulgated pursuant to such general grants of regulatory authority completely invalid. These results were clearly not the General Assembly's intent and so argue conclusively against the construction urged by the Department.

Although KRS 13A.120 does not require that every statute bearing upon an agency's duties and authority include the regulatory grant, it does, as noted, require that every regulation be justified by an express grant of regulatory authority clearly embracing that regulation. That requirement is met here, as the Department's regulatory authority over executions is clearly included within the authority granted by KRS 197.020(1), which provides in pertinent part that

> [t]he Department of Corrections shall: (a) Promulgate administrative regulations for the government and discipline of the penitentiary, for the government and official conduct of all officials connected with the penitentiary, and for the government of the prisoners in their deportment and conduct.

An execution, of course, is one of the most serious official acts carried out by penitentiary officials and the most serious act of governance over a prisoner. This grant of regulatory authority satisfies KRS 13A.120, and thus regulation is permitted. Indeed, KRS 197.020(1) not only permits the promulgation of regulations governing executions, it mandates it. Regulation is also mandated by KRS 13A.100, which requires regulation if, as here, the regulation

4. While we conclude that KRS 13A.100(1) and KRS 13A.120(1) are fully reconcilable, it is worth noting that were they thought to conflict, the more recently enacted statute, KRS 13A.100(1), which the General Assembly adopted in 1990 (1990 Ky. Acts Ch. 516), would control over KRS 13A.120, which was adopted in 1986 (1986 Ky. Acts Ch. 499). *Troxell v. Trammell,* 730 S.W.2d 525, 528 (Ky.1987) ("Our rule [ ] of statutory construction [is] that ... a later statute is given effect over an earlier statute.") *Brown v. Hoblitzell,* 307 S.W.2d 739, 744 (Ky.1956) (noting that while every effort must be made to harmonize statutes on the same general subject, "[i]f the conflict cannot be reconciled, the later statute controls"). Thus, KRS 13A.100(1)'s requirement that administrative rules "that implement ... law" or "affect[ing] private rights or procedures available to the public" be promulgated as regulations would mandate regulation here even if KRS 13A.120(1) were thought to provide otherwise.

will prescribe statements of general applicability which implement laws (such as KRS 431.220) or affect private rights. The bottom line, in other words, is that the Department is not prohibited from adopting regulations to implement the death penalty through lethal injection simply because KRS 431.220 contains no express reference to the adoption of regulations.

Having concluded that our Administrative Procedures Act mandates that the lethal injection protocol be promulgated as a regulation to the extent it affects private rights, it is nonetheless apparent that there may well be minor issues pertinent to an execution which truly are matters of internal management. The identities of the execution team, the storage location of the drugs and other security-related issues can be classified properly as purely issues of internal management. The drug protocol outlined in *Baze v. Rees,* 553 U.S. at ––––, 128 S.Ct. at 1527–1529, 170 L.Ed.2d at 429–430, however, indisputably affects private rights and must be properly adopted pursuant to KRS Chapter 13A before the Department proceeds with further executions.

Finally, while we understand the circuit court's conclusion that the bench trial in *Baze /Bowling I* was an effective public hearing on the current protocol, there is no legal basis for this Court deeming it a substitute for what the General Assembly has required in our Administrative Procedures Act. When a matter must be prescribed by administrative regulation pursuant to KRS 13A.100, the Act must be complied with in all respects. The Department is obligated to proceed pursuant to KRS Chapter 13A as to all aspects of the lethal injection protocol except matters of mere internal management such as those noted above.

## CONCLUSION

The trial court was authorized pursuant to CR 59.05 to vacate its original order and enter its December 27, 2006 order. That order is affirmed, *albeit* on different grounds, as to dismissal of Appellants Bowling and Baze's claims because *res judicata* precludes consideration of a second declaratory judgment action challenging implementation of their respective sentences of execution. However, the trial court erred in concluding that the lethal injection protocol was not subject to promulgation as an administrative regulation pursuant to KRS Chapter 13A and, therefore, the December 27, 2006 order is reversed as to Appellant Moore. The Department of Corrections is required by Kentucky law to promulgate a regulation as to all portions of the lethal injection protocol except those limited issues of internal management that are purely of concern to Department personnel. Accordingly, the December 27, 2006 Order of the Franklin Circuit Court is affirmed in part and reversed in part.

MINTON, C.J.; NOBLE and SCHRODER, JJ., concur. CUNNINGHAM, J., concurring in part and dissenting in part by separate opinion in which SCOTT, J., joins. SCOTT, J., concurring in part and dissenting in part by separate opinion in which CUNNINGHAM and VENTERS, JJ., join.

CUNNINGHAM, J., concurring in part and dissenting in part:

I concur with the majority as to the res judicata issue as to Bowling and Baze. However, I join, and add to, the dissent of Justice Scott. With all due respect, I find no logical justification for extending the holding to Appellants, Bowling and Baze.

In fact, it seems contradictory.

Says the majority concerning the claims of Bowling and Baze: "Res judicata bars consideration of this the second declaratory judgment action, filed by those two Appellants."

But illogically—it seems to me—this Court proceeds to do just that.

The opinion goes on to say: "Finally while we understand the circuit court's conclusion that the bench trial in Baze/Bowling was an effective public hearing on the current protocol, there is no legal basis for the Court deeming it a substitute for what the General Assembly has required in our Administrative Procedures Act."

It puzzles me as to how the barred claims of Bowling and Baze can be sua sponte piggy-backed onto the viable action of Moore.

As Justice Scott points out, the case of Bowling and Baze cries out for closure. Almost two decades have elapsed since the Bowling crime and eighteen years since the crimes of Baze. The latter case has been to the U.S. Supreme Court and back.

For some reason, in October 2007—over two years ago—we effectively stayed this civil action while the U.S. Supreme Court considered the totally unrelated lethal injection issue.

By requiring promulgation of the subject protocol, we are inviting more delay—maybe much more delay. We are implanting another moving part into the already lumbering apparatus of our death penalty appellate process.

We have executed 165 persons in this state without the regulation now deemed required by the majority. These include the latest execution of Marco Chapman after this action was filed. His lawyers asked that his case be stayed until a ruling was made on this very issue. It was denied, however, after Chapman himself asked that it be refused.

The promulgation process will invite further attacks upon the convictions of these men. For instance, KRS 431.220 allows Baze and Bowling up to twenty days before their scheduled executions to choose electrocution instead of lethal injection. On the twenty-first day, they can not only make that choice, but then proceed to challenge the lack of promulgated regulation of the electrocution protocol—an issue arguably not addressed by the majority opinion. The answer would seem obvious. But such reality does not preclude further filings, further briefing, further review by this Court, further delay.

There is no end to the creative mind of the condemned.

It seems to me that the majority opinion turns upon a sterile technicality. It has nothing to do with a fair trial of Appellants. Nothing which affects the severity of the punishment or the humaneness of the method employed. These heavy issues have all been decided—one of them by the highest court of our land. Our decision here today gives the guilty more time to live. It gives the innocent families of the victims more time to suffer.

SCOTT, J., joins.

SCOTT, Justice, concurring in part and dissenting in part:

Although I concur on all other grounds, I must respectfully dissent from my esteemed colleagues' opinion requiring the Department of Corrections to promulgate the lethal injection protocol as an administrative regulation before proceeding with further executions.[5] I dissent because the

5. Both this Court and the United States Supreme Court recently approved the lethal in-

death penalty is not a private right or procedure available to the public and the procedures used by the Department of Corrections are statements of internal management pursuant to KRS 13A.010(2)(a).[6] Therefore, this is not a matter which requires the promulgation of administrative regulations under Kentucky's Administrative Procedures Act (APA).[7]

Currently, there are thirty-six inmates on death row in Kentucky.[8] Thus, it is erroneous to say that lethal injection is a private right or procedure available to the public, when Kentucky's "public" consists of more than 4.2 million people, none of whom could unilaterally choose for the Commonwealth of Kentucky to end their life by means of execution. Though the thirty-six individuals on death row may be executed by the Commonwealth of Kentucky, it is not because they possess this right. Rather, even if a defendant refused to present mitigating evidence at trial and requested a sentence of death in his or her plea agreement, the trial court would not be obligated to impose such sentence. *Chapman v. Commonwealth,* 265 S.W.3d 156, 177 (Ky.2007) ("Sentencing a defendant to death because the defendant volunteers to be executed is improper and is an abuse of discretion."). No person, not even one convicted of a capital offense, has a "right" to the death penalty. As the death penalty is not a private right or procedure available to the public pursuant to a plain reading of KRS 13A.010(2)(a), the Department of Corrections should not be required to promulgate administrative regulations concerning lethal injection.

In addition, by requiring these regulations, the majority adds a new stratum to the already steep terrain which must be traversed before the Commonwealth can carry out an inmate's death sentence. If a civil suit under Kentucky's APA can be used to further delay executions time and time again, where will we find the end of such measures? A multitude of new appeals from this administrative process will now become the new "delay tool" in death penalty protests.

In *Abdur'Rahman v. Bredesen,* 181 S.W.3d 292, 311–12 (Tenn.2005), it was argued that the procedures which made up the lethal injection protocol constituted

jection protocol at issue, holding that it did not violate the prohibitions against cruel and unusual punishment set forth in Section 17 of the Kentucky Constitution and the Eighth Amendment of the United States Constitution. *Baze v. Rees,* 217 S.W.3d 207 (Ky.2006); *Baze v. Rees,* 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008). Since its review by the Unites States Supreme Court, the lethal injection protocol was used to carry out the execution of one inmate, Marco Chapman, on November 21, 2008.

6. KRS 13A.010 reads, in pertinent part:

> (2) "Administrative regulation" means each statement of general applicability promulgated by an Administrative body that implements, interprets, or prescribes law or policy, or describes the organization, procedure, or practice requirements of any administrative body. The term includes an existing administrative regulation, a new administrative regulation, an emergency administrative regulation, an administrative regulation in contemplation of a statute, the amendment or repeal of an existing administrative regulation, but does not include:
>
> (a) Statements concerning *only the internal management of an administrative body and not affecting private rights or procedures available to the public* ...

(emphasis added).

7. KRS 13A.100 describes the matters for which administrative regulations must be promulgated. This statute is prefaced, however, with a statement which narrows its reach: "[s]ubject to limitations in applicable statutes...." KRS 13A.010(2) provides such limitations.

8. Of the thirty-six death-row inmates, there are thirty-five males and one female.

rules which had been adopted in violation of the state's Uniform Administrative Procedure Act (UAPA). The Tennessee Supreme Court, however, held: "a 'rule' does not include '[s]tatements concerning only the internal management of state government and not affecting private rights, privileges or procedures available to the public.'" *Id.* at 311 (*citing* Tenn.Code Ann. 4–5–102(10)(A)). Just as in Tennessee, the Kentucky lethal injection protocol is a matter of the internal management of the Department of Corrections which does not affect private rights or procedures available to the public pursuant to KRS 13A.010(2)(a). Rather, the lethal injection protocol fits neatly within the exception provided by the statute. *Id.*[9]

Moreover, the Tennessee Supreme Court held that the Department of Corrections was not *required* to promulgate their lethal injection protocol before proceeding with executions, in spite of statutory authorization. Under the Tennessee lethal injection statute, Tennessee Code Annotated section 40–23–114(c), the Department of Corrections was specifically *authorized* to promulgate the regulations necessary to implement the statute. The court held that the authority to make regulations regarding lethal injection is not tantamount to a requirement to do so. Kentucky's lethal injection statute, KRS 431.220,[10] provides no such direction to the Department of Corrections concerning the promulgation of regulations.

Furthermore, it is not certain that lethal injection will be the means of execution in the event that Appellants' death sentences are carried out. While KRS 431.220 contains no directive requiring the Department of Corrections to promulgate regulations concerning lethal injection, it does contain another requirement: that any inmate sentenced to death prior to March 31, 1998 is to be given the choice between lethal injection and electrocution. KRS 431.220(1)(b). It is only after an inmate refuses to make this choice at least twenty (20) days before their execution is scheduled to take place that lethal injection is selected by default. *Id.* All three Appel-

9. The majority attacks the relevancy of *Abdur'Rahman* for reasons that sixteen (16) months after its rendition, the governor of Tennessee made a political decision to revamp the execution procedures employed by the state. However, as previously stated, the decision here turns on whether lethal injection affects a right or procedure available to the public. That is the issue we were asked to address and which we have addressed. Political decisions are rightfully the province of the executive and legislative branches of government—not the judicial.

10. KRS 431.220 reads:

(1) (a) Except as provided in paragraph (b) of this subsection, every death sentence shall be executed by continuous intravenous injection of a substance or combination of substances sufficient to cause death. The lethal injection shall continue until the prisoner is dead.

(b) Prisoners who receive a death sentence prior to March 31, 1998, shall choose the method of execution described in paragraph (a) of this subsection or the method of execution known as electrocution, which shall consist of passing through the prisoner's body a current of electricity of sufficient intensity to cause death as quickly as possible. The application of the current shall continue until the prisoner is dead. If the prisoner refuses to make a choice at least twenty (20) days before the scheduled execution, the method shall be by lethal injection.

(2) All executions of the death penalty by electrocution or lethal injection shall take place within the confines of the state penal institution designated by the Department of Corrections, and in an enclosure that will exclude public view thereof.

(3) No physician shall be involved in the conduct of an execution except to certify cause of death provided that the condemned is declared dead by another person.

lants in this case were sentenced to death before March 31, 1998—therefore, it is not even certain any one of them will choose lethal injection as his method of execution. Since they can opt out of lethal injection if they so choose, we should not consider their claims that the Department of Corrections must promulgate the lethal injection protocol as an administrative regulation.

And, even if we were to postpone Appellant Moore's execution until the Department of Corrections promulgates these regulations, the same should not be so for Appellants Baze and Bowling. As the majority held, their claims are barred by *res judicata,* or more particularly, the bar against *splitting causes of action.* Both this court and the United States Supreme Court have held that the lethal injection protocol used by the Commonwealth of Kentucky does not violate their Eighth Amendment rights. *See generally Baze,* 217 S.W.3d 207; *Baze,* 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420. Thus, since their action is barred, their judgment should not be stayed.

Moreover, taking the majority's position to its ultimate conclusion, even though *res judicata* would bar Baze, Bowling, and Moore from bringing another appeal, any other inmate sentenced to death prior to March 31, 1998 could choose electrocution as the manner in which his death sentence is to be carried out, and then pursue lengthy and unnecessary appeals that would force the Department of Corrections to promulgate administrative, regulations regarding the procedures employed for electrocution. If this were to occur, under the majority's reasoning, any inmate sentenced to death prior to March 31, 1998 (including the three Appellants in the case at bar) could opt for electrocution as their means of execution, and their sentences could not be carried out until the Department of Corrections promulgated such regulations.

Since 1911, the Commonwealth of Kentucky has used electrocution to carry out death sentences. Neither before nor after the adoption of Kentucky's APA has the Department of Corrections promulgated administrative regulations regarding electrocution (as the majority is now requiring be adopted concerning lethal injection). While electrocution is still used in Kentucky, the circumstances under which it may be employed are very limited: an inmate sentenced to death prior to March 31, 1998 would have to *choose* electrocution as the means by which his or her death sentence is to be carried out. It defies reason that a method of execution employed since 1911 in Kentucky and not used since 1997 would now—when it can be used in such limited circumstances—be the subject of newly-promulgated regulations.

While recognizing the seriousness of the execution of an inmate, the Department of Corrections, at some point, must be allowed to carry out the sentences through procedures that have already been approved by the highest Courts in both our State and our Nation.

Many years have gone by since these crimes deemed worthy of death have been committed: over thirty (30) years in the case of Appellant Moore, seventeen (17) years in the case of Appellant Baze, and nineteen (19) years in the case of Appellant Bowling. These cases cry out for closure. The families of the victims cry out for closure. The condemned are entitled to closure—not at their own hands, but at the hands of an appropriate judgment. Respect for our law erodes when timely punishment is not given its fair place upon the scales of justice.

It is for these reasons that I dissent from the majority's opinion requiring the

Kentucky Department of Corrections to promulgate the lethal injection protocol as an administrative regulation before conducting further executions.

CUNNINGHAM and VENTERS, JJ., join this opinion.