CUNNINGHAM, J.,
concurring in part and dissenting in part:
Over thirty years ago, on August 10, 1979, in Louisville, Kentucky, 77-year-old Virgil Harris was leaving the A & P grocery store after buying bananas for his ice cream shop located on Seventh Street. Shortly before noon, as he was walking from the grocery store across the parking lot, he encountered the Appellant, Brian Keith Moore. Moore had been out of the penitentiary for less than two years, having served out on charges of first-degree robbery, second-degree assault, and escape. Moore abducted Mr. Harris at gunpoint and drove away in his 1978 maroon Buick to the Jefferson Hill Road. There, in a remote area, Moore pushed Mr. Harris down an embankment and fatally shot him four times in the head at close range. Moore stole Mr. Harris’s watch and wallet, *498 as well as his car. He then drove the victim’s car to the home of his friends, Kenny Blair and Lynn Thompson, where he had stayed the night before. He brought with him a paper sack containing a money bag, a gun, a clip, and several rolls of coins. He even had the bananas.
How do we know all this? Because Brian Keith Moore has told us so several times. He confessed to Kenny Blair and Lynn Thompson, as well as three police officers. He also made incriminating statements in front of a correctional officer. According to the correctional officer, Moore bragged about killing a policeman’s father, and he found Mr. Harris’s final death throes humorous. We don’t even have to take Moore’s word for it.
The jury learned that a person meeting Moore’s description had been observed abducting Mr. Harris. Moore was seen driving the victim’s car. His fingerprints were found inside the victim’s car, as well as on a roll of coins taken from Mr. Harris. Moore was wearing the victim’s wristwatch. There was gunpowder residue on Moore’s hands. Soil samples on Moore’s clothes matched that where the victim’s body was found. Ballistics testing of the gun Moore was carrying matched up to the bullets which killed Mr. Harris.
Brian Keith Moore received two jury trials. The first case was reversed because the jury learned that his main alibi witness was an ax murderer.
I recount all of this history to remind ourselves of the overwhelming evidence of guilt against Moore and the long, tortuous road this case has taken. Two juries have given him the death penalty. Yet, here we are three decades after the murder of his elderly victim sending it back again for more findings by the trial court.
Justice Noble does her typically splendid job of covering all the complex issues raised in this case. In fact, as the reader will see, I glean much of her excellent writing to support my position. I part ways, however, with her and the majority regarding the issue of remanding the case back for further findings by the trial court concerning the DNA. The value of any evidence that can possibly be secured by another hearing is highly questionable. Says the majority through the writing of Justice Noble: “Moreover, it is not even clear that testing that excluded Appellant would demonstrate his innocence. As Appellant himself has made much of, the biological materials on the evidence in this case have degraded over the last 30 years, making basic DNA testing unhelpful.”
In dealing with the new trial issue, the majority also states:
Though the tests demonstrated the presence of another person’s DNA, they did not exclude his DNA. (Footnote omitted). Much like in Bowling, “even if someone else’s DNA was found on the [clothing], this would not exonerate Appellant, and even with an alternate perpetrator theory, the presence of someone else’s DNA would not necessarily be exculpatory.” (Citation omitted). The clothes admittedly did not belong to Appellant originally, and thus had likely been worn by someone else. Additionally, they had been left in a pile of other people’s laundry. Worse still, having first been collected prior to the use of DNA testing, it is unlikely that any precautions were taken to prevent contamination of the evidence, and it is likely that the evidence has been handled by many people, including trial counsel, since then. These scenarios could explain the presence of another person’s DNA on the clothing. (Emphasis added.)
Once again, I have to ask. Why are we sending it back for more findings to deter *499 mine if there should be more testing? The logic escapes me. The majority makes it clear that any evidence of another person’s DNA on the evidence would be of no consequence. I would only add that the dead Blair is the alternate perpetrator put forth by Moore. Since he was cremated, no positive match can be made, even through his nephew. At most, the only determination a test could show with complete certainty is whether the DNA on the evidence was from a person related to the nephew. See generally Frederick R. Bieber, Charles H. Brenner & David Lazer, Finding CRIMINALS Through DNA of their Relatives, 312 SCI. 1315 (2006); Henry T. Greely, Daniel P. Riordan, Naibaa’ A. Garrison & Joanna L. Mountain, Family Ties: The Use of DNA Offender Databases to Catch Offenders’Kin 34 J.L. Med. & Ethics 248 (2006). Also, Moore was living with Blair and his girlfriend at the time of the murder, and it would not be particularly startling for Blair’s DNA to appear.
Yet, inexplicably we hold today that the trial court abused its discretion in failing to consider further testing. We are sending this case back on the very dubious and speculative grounds of wonder. We wonder what it might show.
The Commonwealth has carried its burden of proof for thirty years. Is it not reasonable to conclude that after all these years it might have been the burden of Moore to have shown what favorable results could be exculpatory by further testing? He has not done that.
While the trial Court did find that the requirement for DNA testing was met under KRS 422.285(2), no such finding was made as to the need for the special testing now being requested. Testing was ordered and conducted. Only the additional testing by Orchid Cellmark Laboratory for a more advanced Y-STR form of DNA testing was denied. And we hold in this very opinion that it is not required, at least as to Eighth Amendment claims: “[W]e note that we have already held that no such additional right to DNA testing exists because it is merely a due process right that is satisfied by the statutory mechanism in place.” And, furthermore, we say: “Most of the statute’s requirements are discussed in Bowling and need not be reconsidered here, since the circuit court already ordered testing pursuant to the statute and the testing was performed to the extent possible.” (Emphasis added.)
The advance of science in the area of DNA evidence is a welcomed tool in helping us discover the truth in criminal cases. This new technology should be a means to justice, not an obstacle. Common sense has to dictate when that tool is meaningful.
This case stands in stark contrast to another DNA case we reversed just last month. That was the case of John Roscoe Garland v. Commonwealth, Nos. 2009-SC-000035-MR and 2009-SC-000361-MR, 2011 WL 2112497 (Ky. May 19, 2011). Garland involved the murder of two people. However, the only evidence against Garland was the testimony of one person. That one incriminating person had a criminal record. Garland did not. Garland claimed it was the witness who committed the murders. Clutched in the hand of one of the victims was a clump of hair which did not match in color that of Garland. But it was the hair color of the incriminating witness and person accused by Garland. DNA testing was not available at that trial several years ago. But it is now. The determination of the owner of the hair found clutched in the dead victim’s hand is pivotal to the guilt or innocence — yes, perhaps even the life or death — of Garland. I vigorously joined my other brothers and sisters on this Court in sending it back for DNA testing. Common sense dictated it.
Not so in this case.
*500 I agree completely with the majority in finding that the trial court was in error in concluding that it was restricted to having the evidence examined by the Kentucky State Police Lab under KRS 17.176(3). Significantly, we are not sending the case back, for retesting. We are sending it back for the trial court to consider Moore’s request for retesting. The court has already considered it and denied it. Perhaps the additional testing was denied for the wrong reason, but the denial was harmless for the following reasons: (1) as this Court has acknowledged, the 30-year-old evidence to be tested is degraded and contaminated substantially; (2) we have held that the presence of anyone else’s DNA, especially in light of the age of the evidence, would not be exonerating; (3) positive DNA of Moore has never been found on the evidence and, therefore, no DNA evidence has ever been used to incriminate him; and (4) conclusions which might be reached by retesting that totally excluded Moore’s DNA has no probative value. Such misreading of the statute by the trial court was obviously harmless because of our ruling in Bowling. The posture of this case makes any further exami-. nation unnecessary.
I need not remind this Court that, in a death penalty case, there is nothing cursory about a remand. Nor should there be. We will not likely see this case again for two years. What additional issues will be deposited upon our door step when we see it again is beyond our prophetic powers. As I stated in my opinion concurring in part and dissenting in part in Bowling v. Kentucky Dept. of Corrections — which is still out there somewhere awaiting our further consideration — “There is no end to the creative mind of the condemned.” 301 S.W.3d 478, 493 (Ky.2009).
If we have seen a decline and endless delays in the application of the death penalty in recent years, it is not at the behest of citizens of this state or of this nation. The death penalty, authorized by our democratically elected legislature and mandated by the electorate, is being slowly strangled by the lack of common sense from both state and federal appellate courts. I am afraid that our decision today is another such example.
Therefore, I concur in all but the remand, to which I respectfully dissent.
SCHRODER and SCOTT, JJ„ join.