IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 6, 2024

**STATE OF TENNESSEE v. KELBY LERHA TAYLOR**

**Appeal from the Circuit Court for McNairy County**
**No. 4538      J. Weber McCraw, Judge**

———————————————

**No. W2023-00693-CCA-R3-CD**

———————————————

The Defendant, Kelby Lerha Taylor, appeals his convictions for nine counts of incest, eight counts of rape, three counts of sexual battery by an authority figure, two counts of aggravated assault, and one count of aggravated rape. Specifically, the Defendant argues that his substantive due process and fair trial rights were violated when the State, after its case-in-chief, dismissed a count charging continuous sexual abuse of a child under the Child Protection Act ("CPA"). This dismissal occurred after the Defendant had previously withdrawn a motion to sever the offenses based upon his understanding that the presence of the CPA charge necessitated joinder of at least some of the offenses. The Defendant additionally challenges the sufficiency of the evidence supporting his convictions. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which J. ROSS DYER and JOHN W. CAMPBELL, SR., JJ., joined.

Bryan R. Huffman (on appeal), and David A. Stowers (at trial), Covington, Tennessee, for the appellant, Kelby Lerha Taylor.

Jonathan Skrmetti, Attorney General and Reporter; Christian N. Clase, Assistant Attorney General; Mark E. Davidson, District Attorney General; and Lisa Miller and Harrison Hight, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.      FACTUAL AND PROCEDURAL HISTORY**

## A.    Background and Pretrial Proceedings

This case arises from the Defendant's perpetrating a number of sexual offenses against his minor daughter, K.S.,[1] between August 2016 and December 2020.  From these incidents, a single indictment was returned against the Defendant charging him with twenty-eight offenses.   Using information from the indictment, the State's bill of particulars and election of offenses, and the judgment forms, we have compiled the following chart to outline the Defendant's charges, including their alleged dates and locations as well as their ultimate dispositions:

| Count | Offense | Dates | Location | Disposition |
|---|---|---|---|---|
| 1 | Rape | August 1, 2016– May 31, 2017 | Laundry room | Guilty |
| 2 | Incest | August 1, 2016– May 31, 2017 | Laundry room | Guilty |
| 3 | Rape | August 1, 2016– May 31, 2017 | Laundry room | Guilty |
| 4 | Incest | August 1, 2016– May 31, 2017 | Laundry room | Guilty |
| 5 | Aggravated Sexual Battery | January 1, 2016–December 31, 2018 | Victim's bedroom | Dismissed on State's motion |
| 6 | Aggravated Assault | January 1, 2016–December 31, 2018 | Victim's bedroom | Guilty |
| 7 | Rape | January 1, 2016–December 31, 2019 | Victim's bedroom | Guilty |
| 8 | Rape | January 1, 2016–December 31, 2019 | Victim's bedroom | Guilty |
| 9 | Incest | January 1, 2016–December 31, 2019 | Victim's bedroom | Guilty |
| 10 | Incest | January 1, 2016–December 31, 2019 | Victim's bedroom | Guilty |

---

[1] It is the policy of this court to refer to victims of sexual crimes by their initials.

| 11 | Rape | May 1, 2019– August 31, 2019 | Oldest brother's bedroom | Guilty |
|---|---|---|---|---|
| 12 | Incest | May 1, 2019– August 31, 2019 | Oldest brother's bedroom | Guilty |
| 13 | Aggravated Rape | November 1, 2019–November 30, 2020 | Parents' bedroom | Guilty |
| 14 | Incest | November 1, 2019–November 30, 2020 | Parents' bedroom | Guilty |
| 15 | Aggravated assault | November 1, 2019–November 30, 2020 | Parents' bedroom | Guilty |
| 16 | Rape | November 1, 2019–November 30, 2020 | Hallway | Guilty |
| 17 | Incest | November 1, 2019–November 30, 2020 | Hallway | Guilty |
| 18 | Rape | February 1, 2020–February 28, 2020 | Youngest brother's bedroom | Guilty |
| 19 | Incest | February 1, 2020–February 28, 2020 | Youngest brother's bedroom | Guilty |
| 20 | Sexual battery by an authority figure | March 1, 2020– March 31, 2020 | Youngest brother's bedroom | Dismissed on State's motion |
| 21 | Sexual battery by an authority figure | April 1, 2020– April 30, 2020 | Middle brother's bedroom | Guilty |
| 22 | Sexual battery by an authority figure | October 1, 2020–November 30, 2020 | Parents' bedroom | Guilty |
| 23 | Rape | November 17, 2020–November 30, 2020 | Parents' bedroom | Guilty |

| 24 | Incest | November 17, 2020–November 30, 2020 | Parents' bedroom | Guilty |
|----|--------|--------|--------|--------|
| 25 | Rape | November 1, 2020–December 1, 2020 | Middle brother's bedroom | Dismissed on State's motion |
| 26 | Incest | November 1, 2020–December 1, 2020 | Middle brother's bedroom | Dismissed on State's motion |
| 27 | Sexual battery by an authority figure | December 1, 2020 | Victim's bedroom | Guilty |
| 28 | Continuous sexual abuse of a child | August 1, 2016–December 1, 2020 | | Dismissed on State's motion |

As to count 28, the indictment alleged that the continuous sexual abuse of a child charge was based upon the Defendant's perpetration of rape and sexual battery by an authority figure. *See* Tenn. Code Ann. §§ 39-13-503, -527. While the State's bill of particulars described count 28 as "encompass[ing] all charges which all occurred in the family home[,]" the State later filed a "State's Identification of Offenses for Count 28." *See* Tenn. Code Ann. § 39-13-518(d). In the State's identification of offenses, it reiterated that count 28 was based on the specific charges originally set forth in the indictment—i.e., nine counts of rape and four counts of sexual battery by an authority figure.

On December 2, 2021, the Defendant filed a motion pursuant to Tennessee Rule of Criminal Procedure 14 to sever his charged offenses. The Defendant alleged that the State had permissively joined his offenses in one indictment but that "no count [was] part of a common scheme or plan and, furthermore, the evidence from each count would not [have been] admissible in the trial of any other count." The Defendant sought severance of all offenses and moved the trial court to "try each and every offense in separate trials." The motion was not heard or ruled upon prior to trial, for reasons we will discuss in greater detail below. On November 3, 2022, the Defendant proceeded to a jury trial on all twenty-eight counts.

B.      Trial

The victim provided her birthdate and testified that in 2016, her family moved to Selmer, Tennessee. Her family included her, her father (the Defendant), her mother, and her three brothers. Approximately one and one-half months after moving, the Defendant

- 4 -

began sexually abusing her. This abuse continued from August 2016 through December 2020.

The family residence was a two-story home with the living room, kitchen, and laundry room located on the first level. The second level consisted of the victim's bedroom, her bathroom, her three brothers' separate bedrooms, her brothers' bathroom, her parents' bedroom, her parents' bathroom accessible by walking through her parents' bedroom, and a hallway. The abuse occurred in the laundry room, the victim's bedroom, her parents' bedroom and bathroom, all three brothers' bedrooms, and the hallway. As the victim testified to these incidents by the location where they occurred rather than in chronological order, we will do the same.

As to the incidents in the laundry room, one happened when the victim was in the eleventh grade and was in trouble for being on social media. The Defendant told her to go to the laundry room and take off her pants. The victim believed she was about to get a "whooping." The Defendant brought in two couch cushions, placed them on the floor, and told the victim to get on top of him. The victim refused, and the Defendant "grabbed" the victim, pulled her shorts down, and put the victim on top of him. The Defendant put his penis inside the victim's vagina, held the victim by the waist, and "just mov[ed] his hips up and down." He ejaculated on her leg.

When the victim was around fifteen or sixteen, the Defendant told her to go to the laundry room and "get up" against the dryer. The victim refused, which angered the Defendant. He initially became upset and walked away, but he then returned and "did it anyway." The Defendant got behind the victim, removed her pants, and put his penis inside her vagina. He eventually ejaculated onto the victim's leg and buttocks. The Defendant used a towel to clean the area, gave the towel to the victim, and left. The victim then took a shower. While the victim did not detail any other instances of sexual abuse in the laundry room, she stated it happened around four or five times and "any other time it was the same thing."

The victim testified about several incidents that took place in her bedroom. On one particular occasion, the victim was around sixteen or seventeen when the Defendant told her three brothers to mow the lawn, even though mowing the lawn did not require three people. To avoid being alone in the family residence with the Defendant, the victim began to put on her shoes to join her brothers outside. Before she could exit the residence, however, the Defendant came into her bedroom and lay down on her bed, which was visible from the hallway. With the victim's bedroom door open, the Defendant lifted the victim's dress and began touching her breasts. The Defendant pulled out his penis and put it inside the victim's vagina. After about three minutes, the victim's middle brother returned

- 5 -

upstairs to retrieve a pair of gloves. The Defendant told his middle son to go back downstairs. The Defendant then left the victim's room. The victim did not tell the Defendant "no" during this incident because she believed her brother would get her other two brothers and return to help her. She said the incident felt "very gross."

On another occasion, when the victim was a sophomore in high school, she had gotten in trouble for being on social media. The Defendant said he would "whoop" her for lying about it and forced her to stay awake until the rest of the family went to bed. When he returned to her bedroom late that night, he brought couch cushions with him. He placed the cushions in the middle of the victim's bedroom doorway and put the victim on top of him. The victim tried to refuse as she only wanted to go to sleep. He put his penis inside her vagina, thrusted his hips, and ejaculated onto her legs. He then took the cushions and left.

As to the incidents in the victim's parents' bedroom and bathroom, she, the Defendant, and her youngest brother were watching a movie together. The Defendant told her brother to get some drinks from the kitchen downstairs. When her brother left, the Defendant began touching the victim under her clothes on her buttocks and attempted to get the victim to take off her clothes. When her brother returned, the Defendant told him to leave. When her brother left the room, the victim left with him.

At one point, the victim ran away from the family residence because "no one was hearing what [she] was trying to tell them." Once she was brought back to the residence by the Defendant and her two older brothers, the Defendant beat her with an extension cord. He believed she ran away to "be with boys." However, according to the victim, her relationship with an older man that she had previously dated had already ended. About a week after running away, the victim was on the computer in her parents' bedroom. Her mother was at work, and her brothers were in their bedrooms. The Defendant put an ax against her legs and said, "[I]f you ever run out [of] the house, I'm going to use this ax and chop off your legs off." He put the ax down, which remained in the victim's peripheral vision, and told her to take off her pants and get in her parents' bed. While the victim did not immediately comply, she was still scared of the Defendant, explaining he was "huge" and was threatening her with the ax. The Defendant then removed the victim's pants and started touching her vaginal area. The Defendant then grabbed the victim, put her "onto his body," put his penis inside her vagina, and moved her hips "up and down." Once finished, the Defendant went to the bathroom, and the victim remained in the bed and cried. The victim identified the ax recovered by law enforcement from the family residence, and it was entered as an exhibit at trial.

Another time, while in her parents' bathroom, the Defendant aimed a gun at the victim's head saying he was going to shoot her. He told her to get on her knees and face the shower. The victim refused, explaining that if he was going to shoot her, then she wanted to "look dead at [the Defendant]" while he did it. Although her brothers were home and she was "scared for [her] life," she did not call for help because she wanted the Defendant to shoot her so she would no longer have to endure the abuse. The Defendant left the bathroom and sat on his bed in the bedroom. He placed the gun under his bed and returned to the bathroom. He sat on the toilet seat, pulled his penis from his pants, grabbed the victim and removed her pants, and put the victim on top of him. On cross-examination, the victim acknowledged testifying at a previous hearing that this incident happened in her bedroom. She explained she had tried to forget the situation and acknowledged the actual assault with the gun took place in her bedroom or in her parents' bathroom while the gun was kept in her parents' bedroom. The victim identified the gun used by the Defendant, which was recovered by law enforcement from the family residence and entered as an exhibit at trial.

While the victim's oldest brother was away at college, the Defendant ordered the victim to go to her oldest brother's bedroom. Once in the bedroom, the Defendant told the victim to "turn around and grab the mattress." The victim refused, and the Defendant, upset, briefly left the bedroom. When he returned, he grabbed and hugged the victim, touching her buttocks and breasts. He then removed her pants, made her grab the bed, and put his penis inside her vagina. He ejaculated onto the victim's back, buttocks, and legs. He gave her a towel and left.

Another time, the Defendant ordered the victim into the victim's middle brother's bedroom to talk about the older man she was dating. During this conversation, the Defendant told her to be honest about her dating situation. The victim "came clean" but stated the Defendant did not believe her. He proceeded to touch the victim under her clothes on her breasts, buttocks, and vagina. When her brothers began walking up the stairs, the Defendant left the bedroom.

On a different day, the Defendant was upset that the victim was wearing a tank top and shorts. He ordered her into her youngest brother's bedroom and, while in the bedroom with the door open, threatened to "whoop" her with a cord if she did not change clothes. The Defendant then removed the victim's pants and forced her to sit on the edge of a chair. Despite her refusal, he proceeded to put his penis inside her vagina and ejaculated onto her leg. Afterwards, the victim went downstairs to the kitchen, told her mother what had happened, and showed her mother the ejaculate on her leg. Her mother questioned the Defendant but never said or did anything upon returning to the kitchen. The victim also stated her brothers were home in the living room during this incident.

Related to the incident in the hallway, the victim was in middle school and was watching television in her bedroom. The Defendant placed two couch cushions by the victim's bathroom in the upstairs hallway. He lay down on the cushions and motioned for the victim to come toward him. The victim looked at him "like [she] didn't want to get up" and then went to use her bathroom. The Defendant entered her bathroom and told her she would get in trouble for "whatever" he made up in his head. She asked what she was supposed to do, and the Defendant returned to the hallway and lay down on the cushions. The victim was wearing a dress, and the Defendant removed her underwear and put her on top of him. The Defendant put his penis inside her vagina and thrusted his hips while the victim lay on top of him. He ejaculated onto her stomach area. While the victim's testimony did not include descriptions of other instances of sexual abuse in the hallway, she said other incidents happened in the same way in that location.

On December 2, 2020, the victim disclosed the sexual abuse to her guidance counselor. She explained she had taken a college entrance exam on December 1, 2020, and felt like she did poorly on the exam because she was distracted by what was happening to her at home. She said the Defendant had touched her the night before and stated this was while her mother was away helping her middle brother, who was injured during a basketball game in Bolivar, Tennessee. While the victim acknowledged that the Defendant came to her school on December 2 to complain about the older man he believed she was dating, the victim was not aware he planned to do this, as she had already disclosed the sexual abuse by the time he arrived.

The victim acknowledged the Defendant was a disciplinarian and had placed a camera in her bedroom, the only camera inside the house. While the Defendant allowed the victim's brothers to play sports and have social media, he did not allow her the same privileges. She affirmed her brothers and mother were home during several of the incidents, but she did not know what they witnessed. While she disclosed it to her brothers, she did not know whether they told anyone because they were "children" and "afraid."

The victim's middle brother testified and recalled returning to the house one day from mowing the lawn to retrieve a pair of gloves. When he went upstairs, he saw the Defendant with his pants halfway down on top of the victim. He admitted he never asked the victim or the Defendant about this incident. He told his older brother, who said to tell their mother. The victim's middle brother said that after he did so, his mother told him that she had confronted the Defendant about it. While the victim's middle brother did not discuss the sexual abuse with the victim, he stated, "It wasn't the first time she told me but . . . I didn't believe it because it was family but I seen [sic] it with my own eyes so I had to tell my mother."

The victim's mother identified a 2020-2021 basketball schedule for her middle son that showed an away game in Bolivar on December 1, 2020. She affirmed that her middle son was injured during this game and that while helping him, she was away from the family residence that evening. She acknowledged the victim had told her "somebody" was touching her, but the victim never said it was the Defendant. When the victim's mother questioned the Defendant about his knowledge of any abuse, he denied knowing anything. She acknowledged being scared of the Defendant at times and being away from the home often.

Jason Hurt met the Defendant while in jail, and the two discussed the Defendant's charges. The Defendant told Mr. Hurt he used to watch the victim through a camera in her bedroom because she was dating a boy. During one of their conversations, the Defendant asked Mr. Hurt if Mr. Hurt had ever "screwed" his own daughter. Mr. Hurt reported the comment and acknowledged receiving in return weekend service for the last ten days of his incarcerative sentence for aggravated burglary. He clarified that he only wanted to do "the right thing" and that he did not receive any deal for his testifying.

During a bench conference at trial, the parties discussed the State's election of offenses and whether the trial would continue into the next day. During this conversation, the parties began discussing the CPA and how the Defendant's charged offense pursuant to the CPA would be classified for sentencing purposes and should be charged to the jury. The parties expressed different interpretations of the offense classifications, noting the limited caselaw on the subject and the complexity of the language in the statute. When the trial court asked the State whether they intended to dismiss the CPA charge in count 28, defense counsel added that he had withdrawn his motion to sever the Defendant's offenses on the understanding that the State would be proceeding with the CPA charge.[2] The State responded, "The State has been going forward," to which defense counsel replied, "I know, and I know [the State is] not trying to dismiss it."

Later that day, at the close of the State's proof, the State elected the offenses it would submit to the jury and dismissed count 28 along with four other offenses. The Defendant did not object to the dismissal of count 28. While the Defendant moved for a judgment of acquittal, this motion was based solely on conflicting witness testimony; no mention was made of the State's dismissal of count 28. The trial court denied the motion, and the Defendant elected to testify.

---

[2] The statute requires that the "separate incidents" underlying the CPA charge "be alleged in separate counts and joined in the same action." Tenn. Code Ann. § 39-13-518(f).

The Defendant denied sexually abusing the victim and said the victim's middle brother's and Mr. Hurt's testimonies were untrue. The Defendant described himself as a strict parent to all his children, not allowing any of his children to have social media. He explained that he did not allow the victim to be on social media because she was "[w]atching pornography and trying to set up dates with men[.]"

He did not allow the victim to have boyfriends or male friends and did not allow her to play basketball because it was "an avenue for boys for her." He acknowledged he allowed his sons to play sports. He further acknowledged there was a camera in the victim's room, which the victim's mother asked him to install because the victim had been sneaking out of the family residence.

The jury found the Defendant guilty on all submitted charges. At a subsequent sentencing hearing, the trial court imposed an effective sentence of thirty years in the Tennessee Department of Correction. During the sentencing hearing, defense counsel commented he had originally "filed a motion to sever almost as a reflex," but given that the last count of the indictment was the CPA, he withdrew his motion because "it couldn't be severed based on the statute[.]"

The Defendant later filed a motion for new trial alleging, inter alia, that the evidence was insufficient and that the Defendant's rights to a fair trial and due process were violated when, after the close of the State's proof, the State dismissed count 28 charging continuous sexual abuse of a child. At the motion for new trial hearing, defense counsel argued he "had to withdraw [his motion to sever] based on the law" because, under the CPA, the State was allowed to "bring in the twenty-seven counts or . . . fourteen separate incidences[.]" Defense counsel acknowledged there were "one or two" counts that could have been severed notwithstanding the CPA but conceded he decided to withdraw the motion to sever nevertheless. The trial court denied the motion. This timely appeal followed.

## II.  ANALYSIS

### A.  Right to a Fair Trial and Due Process

The Defendant argues he was denied his rights to a fair trial by an impartial jury and substantive due process as protected by the United States and Tennessee Constitutions. He asserts the State's dismissal of the CPA count created a situation where Tennessee Rule of Criminal Procedure 14 was effectively circumvented, thus allowing otherwise prejudicial propensity evidence of his other sexual offenses to be introduced to the jury. He contends he withdrew his motion to sever his offenses prior to trial because the CPA permitted his offenses to be prosecuted in a single action. However, the State, after its close of proof,

dismissed this count, which effectively allowed the jury to hear evidence of multiple, unrelated sexual offenses that otherwise would have been tried separately. While he acknowledges the State is permitted to charge offenses under the CPA and has broad discretion to dismiss indicted counts, he argues that he was nevertheless denied substantive due process and a fair trial under these circumstances. The Defendant further concedes defense counsel failed to object or move for a mistrial on these grounds but contends the issue is not waived because it was included in his motion for new trial. Alternatively, he argues he is entitled to plain error relief.

The State responds that the Defendant has waived his due process challenge by not objecting at trial to the dismissal of this count or by moving for a mistrial based on these grounds. It further argues the Defendant is not entitled to plain error relief because no clear and unequivocal law was breached, no substantial right was adversely affected, and plain error relief is not necessary to do substantial justice.

### 1. Constitutional Principles

#### a. Due Process

The Fifth and Fourteenth Amendments of the United States Constitution prohibit the federal and state governments from depriving any person "of life, liberty, or property, without due process of law." U.S. Const. amend. V, amend. XIV, § 1. Article 1, section 8 of the Tennessee Constitution provides, "[N]o man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land." Our federal and state constitutions encompass both procedural and substantive due process principles. *Lynch v. City of Jellico*, 205 S.W.3d 384, 391 (Tenn. 2006). "The most basic principle underpinning procedural due process is that individuals be given an opportunity to have their legal claims heard at a meaningful time and in a meaningful manner." *Id*. In contrast to procedural due process, substantive due process, the basis of the Defendant's argument here, "bars oppressive government action regardless of the fairness of the procedures used to implement the action." *Mansell v. Bridgestone Firestone North American Tire, LLC*, 417 S.W.3d 393, 409 (Tenn. 2013). Substantive due process is implicated where the government acts in a manner that is (1) arbitrary, irrational or improperly motivated or (2) so egregious that it shocks the conscience. *County of Sacramento v. Lewis*, 523 U.S. 833, 840; *see also Abdur'Rahman v. Bredesen*, 181 S.W.3d 292, 309 (Tenn. 2005).

- 11 -

### b. Right to a Fair Trial

A right to a fair trial is guaranteed by the Due Process Clause of United States Constitution and its counterpart in the Tennessee Constitution. U.S. Const. amend. XIV, § 1; Tenn. Const. art. I, § 8; *see State v. Rimmer*, 623 S.W.3d 235, 256 (Tenn. 2021); *State v. Carruthers*, 35 S.W.3d 516, 559 (Tenn. 2000). The United States Constitution "defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 684-85 (1984). In Tennessee, these elements are enunciated in article I, section 9 of our Constitution. *See Carruthers*, 35 S.W.3d at 559. To put it succinctly, "[T]he right of trial by jury shall remain inviolate." Tenn. Const. art. I, § 6.

"The right to an impartial jury is a fundamental aspect of a fair trial." *State v. Davidson*, 509 S.W.3d 156, 193 (Tenn. 2016) (citing *State v. Odom*, 336 S.W.3d 541, 556 (Tenn. 2011)); *see generally In re Murchison*, 349 U.S. 133, 136 (1955) (explaining a "fair trial in a fair tribunal is a basic requirement of due process"). An impartial jury is "one which is of impartial frame of mind at the beginning of trial, is influenced only by legal and competent evidence produced during trial, and bases its verdict upon evidence connecting defendant with the commission of the crime charged." *Davidson*, 509 S.W.3d at 193 (citing *Durham v. State*, 188 S.W.2d 555, 558 (Tenn. 1945)). Our supreme court has acknowledged principles involving joinder and severance of criminal offenses may implicate a "defendant's right to a fair trial before an impartial jury (uninfluenced by evidence of other offenses)[.]" *State v. Johnson*, 342 S.W.3d 468, 472 (Tenn. 2011); *see State v. Denton*, 149 S.W.3d 1, 14-15 (Tenn. 2004).

### 2. The Child Protection Act

On July 1, 2014, the General Assembly enacted the Child Protection Act. Tenn. Code Ann. § 39-13-518; 2014 Tenn. Pub. Acts, ch. 940, § 5. The CPA created a new criminal offense which permits certain enumerated acts of sexual abuse against one or more child victims within a specified time period to be charged as a single offense. *See* Tenn. Code Ann. § 39-13-518(b), (f); *State v. Runions*, No. M2019-00940-CCA-R3-CD, 2020 WL 7238537, at *11-13 (Tenn. Crim. App. Dec. 9, 2020). As relevant to this appeal, a defendant commits continuous sexual abuse of a child who, "over a period of ninety (90) days or more, engages in multiple acts of sexual abuse of a child[.]" Tenn. Code Ann. § 39-13-518(b)(1). "Multiple acts of sexual abuse of a child" includes engaging in three or more incidents of sexual abuse of a child involving the same minor child on separate occasions. *Id.* § -518(a)(1)(A)(i). Rape and sexual battery by an authority figure constitute sexual abuse of a child. *Id.* § -518(a)(2)(B), (E).

The State "may charge alternative violations of [section 39-13-518] and of the separate offenses committed within the same time period. The separate incidents shall be alleged in separate counts and joined in the same action." *Id*. § -518(f). This provision is not a "work around" of evidentiary and procedural rules but is instead a way to address the concern of "sexual assaults against young children who are normally unable to identify the exact dates of the offenses when there are ongoing acts of sexual abuse." *Runions*, 2020 WL 7238537, at *12 (quoting *Baez v. State*, 486 S.W.3d 592, 595 (Tex. Ct. App. 2015)) (rebuffing an argument that the CPA is a loophole to Tennessee Rule of Evidence 404(b) and Tennessee Rule of Criminal Procedure 14).

### 3. Waiver

A party is not entitled to relief when it failed to take whatever action was reasonably available to prevent or nullify a harmful effect of an error. Tenn. R. App. R. 36(a). As such, a party is not allowed to raise an issue on motion for new trial that was not presented to the court at the trial of the case. *See, e.g.*, *State v. Aucoin*, 756 S.W.2d 705, 715 (Tenn. Crim. App. 1988) (holding a jury deliberation issue waived for failure to object, make a motion for mistrial, or request curative instructions); *State v. McLemore*, No. M2010-01189-CCA-R3-CD, 2012 WL 695325, at *11 (Tenn. Crim. App. Feb. 6, 2012) (holding the defendant waived plenary review of bifurcation issue when he raised it for the first time in his motion for new trial); *State v. Flamini*, No. E2008-00418-CCA-R3-CD, 2009 WL 1456316, at *4 (Tenn. Crim. App. May 26, 2009) (holding an alleged due process violation waived because the defendant first raised the issue in his motion for new trial).

Initially, we note the Defendant argues he was "constrained" by the CPA to withdraw his motion to sever his offenses. However, the CPA simply authorizes joinder for certain enumerated sexual crimes with the CPA charge. *See* Tenn. Code Ann. § 39-13-518(a)(2), (f). Only the Defendant's rape and sexual battery by an authority figure offenses were included in the indictment and the State's notice as predicate offenses for the CPA charge. Additionally, defense counsel acknowledged at the motion for new trial hearing that the CPA did not necessarily require joinder of "one or two [counts.]" We cannot speculate how the trial court would have applied the severance principles found in Tennessee Rule of Criminal Procedure 14 had the Defendant pursued his severance motion as to the fourteen offenses not included as predicates to count 28. In any event, the CPA did not preclude the Defendant from seeking severance of these remaining counts. Therefore, regardless of the State's dismissal of count 28, any argument as to these remaining fourteen counts is waived. Tenn. R. App. P. 36(a).

As to the nine counts of rape and four counts of sexual battery by an authority figure included in the CPA charge, we conclude the issue is likewise waived. While the

- 13 -

Defendant concedes the State had the right to dismiss count 28 and does not challenge its authority to do so, he challenges the circumstance created by the State's dismissal. The Defendant acknowledged at trial that the presence of the CPA count impacted his pretrial decision to abandon the severance motion. Once the dismissal occurred, it was incumbent upon the Defendant to object or request a mistrial, which the Defendant concedes he failed to do. Such action would have allowed the Defendant to preserve the issue for appeal and to argue for a new trial and severance of his offenses. As he failed to take this reasonable action to cure the alleged error, he has waived plenary review of this issue. Tenn. R. App. P. 36(a); Tenn. R. Crim. P. 51(b). Appellate review is, therefore, limited to plain error review. *See* Tenn. R. App. P. 13(b).

### 4. Plain Error Review

"When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In conducting plain error review, a court will reverse for plain error only if the five following prerequisites are satisfied:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be present in the record before an appellate court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established. *Id*. at 283. In order to warrant plain error relief, the magnitude of the error must have been so significant "that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642 (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)).

Plain error relief should be "sparingly exercised[,]" *see State v. Bledsoe*, 226 S.W.3d 349, 354 (Tenn. 2007), and is only appropriate for errors that are "especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding," *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006). A defendant has the burden of persuading the appellate court that plain error exists. *Bledsoe*, 226 S.W.3d at 355.

Here, the Defendant has failed to establish a clear and unequivocal rule of law was breached. It is the State's prerogative to elect which offenses to move forward with at the close of its proof. *See State v. Harrington*, 627 S.W.2d 345, 348 (Tenn. 1981); *State v. Gory*, No. W2023-00062-CCA-R3-CD, 2023 WL 8544773, at *5 (Tenn. Crim. App. Dec. 11, 2023) (stating that it was within the State's prerogative to dismiss at the close of its proof an aggravated sexual battery count from the two-count indictment also charging rape of a child and that such dismissal did not render the defendant's trial unfair); *cf. State v. Layman*, 214 S.W.3d 442, 452-453 (Tenn. 2007) (concluding a trial court must generally approve the State's uncontested dismissal of a charged offense pursuant to Tennessee Rule of Criminal Procedure 48(a) absent the dismissal being contrary to the manifest public interest, including bad faith). Here, the State dismissed count 28, seemingly at the suggestion of the trial court, only after a lengthy discussion concerning the complexities of the CPA and its sentencing provisions. As the Defendant has acknowledged, the record does not reflect that the State acted in bad faith in dismissing the charge. The Defendant admits, and we agree, that the State acted within its discretion in charging and later dismissing count 28. The Defendant, therefore, has failed to established a clear and unequivocal breach of law exists for us to grant plain error relief.

Additionally, the Defendant has failed to establish a substantial right of his was adversely affected. The Defendant's entire argument is premised on the assumption that his offenses would have been severed pretrial but for the presence of count 28 and the operation of the joinder provision in Code section 39-13-518(f). Aside from this conclusory assertion, the Defendant offers no authority or argument to support his contention that his offenses would have been severed pursuant to Tennessee Rule of Criminal Procedure 14. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Furthermore, the Defendant's argument regarding propensity evidence is predicated upon his unsupported statement that he would have been entitled to severance of his offenses. But the only prejudicial evidence identified by the Defendant on this point pertains to proof supporting the other charged offenses in the indictment. Absent a persuasive showing that these offenses would have been severed, they are not "other acts" as contemplated by Rule 404(b), but are instead part and parcel of the charged conduct for which the Defendant was on trial. *See State v. Rickman*, 876 S.W.2d 824, 827-29 (Tenn. 1994) (holding evidence of other sex crimes relevant and admissible which allegedly occurred during the time as those sexual offenses charged in the indictment); *Runions*, 2020 WL 7238537, at *12 (noting "the underlying crimes are not 'other bad acts' for purposes of Tennessee Rule of Evidence 404(b), they are part of the charged misconduct"). In short, the Defendant has not shown that his offenses would have been severed but for the application of CPA, and he therefore cannot meet his burden of

- 15 -

demonstrating that his substantive due process or fair trial rights were violated under the circumstances of this case. As such, he is not entitled to plain error relief.

## B. Sufficiency of the Evidence

The Defendant argues the evidence was insufficient to support his convictions. Instead of challenging the sufficiency of the evidence supporting the elements of any specific offense, the Defendant broadly challenges the sufficiency of the convicting evidence based on the victim's testimony being "highly improbable" and unreliable and on the lack of physical evidence other than the recovered firearm and ax. The State responds that the evidence was sufficient and that questions concerning witness credibility are resolved by the jury. We agree with the State.

The United States Constitution prohibits the states from depriving "any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. A state shall not deprive a criminal defendant of his liberty "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In determining whether a state has met this burden following a finding of guilt, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, the defendant has the burden on appeal of illustrating why the evidence is insufficient to support the jury's verdict. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). If a convicted defendant makes this showing, the finding of guilt shall be set aside. Tenn. R. App. P. 13(e).

"Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Appellate courts do not "reweigh or reevaluate the evidence." *Id*. (citing *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978)). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The law provides this deference to the jury's verdict because

> [t]he jury and the [t]rial [j]udge saw the witnesses face to face, heard them testify, and observed their demeanor on the stand, and were in much better position than we are, to determine the weight to be given their testimony. The human atmosphere of the trial and the totality of the evidence before the

> court below cannot be reproduced in an appellate court, which sees only the written record.

*Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963) (internal quotations and citations omitted). Therefore, on appellate review, "the State is entitled to the strongest legitimate view of the trial evidence and to all reasonable or legitimate inferences which may be drawn therefrom." *Cabbage*, 571 S.W.2d at 835.

Here, the jury heard the victim testify to multiple incidents of the Defendant's, her biological father, touching her on her genitalia, buttocks, and breasts, penetrating her vagina with his penis, and threatening her with a firearm and ax, all while the victim was in middle school and high school. Her testimony alone is sufficient to support the Defendant's convictions. *State v. Bonds*, 189 S.W.3d 249, 256 (Tenn. Crim. App. 2005) ("It is well-settled law in Tennessee that 'the testimony of a victim, by itself, is sufficient to support a conviction.'") (quoting *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)). While the Defendant denied such events occurred and asserted that the victim had multiple reasons to lie, such as the Defendant's being a strict disciplinarian, the jury chose to credit the victim's version of events, as was its province. *See Bland*, 958 S.W.2d at 659. Moreover, the victim's testimony was supported by her middle brother's testimony of seeing the Defendant on top of the victim with his pants pulled down, by the recovery of the firearm and ax the victim referenced in her testimony, by victim's mother's testimony that the victim disclosed someone was touching her, and by Mr. Hurt's account of his discussions with the Defendant. The Defendant, thus, essentially requests that we reweigh the credibility of the witnesses, which is beyond our purview. *Bland*, 958 S.W.2d at 659 (citing *Cabbage*, 571 S.W.2d at 835). Therefore, when viewed in the light most favorable to the State, the evidence sufficiently supports the Defendant's convictions.

## III. CONCLUSION

Based upon the foregoing and the record as a whole, we affirm the judgments of the trial court.

____________________________________
KYLE A. HIXSON, JUDGE